# McCLAUGHRY *v.* DEMING.

APPEAL FROM THE CIRCUIT COURT FOR THE DISTRICT OF KANSAS.

No. 610. Argued April 28, 29, 1902.—Decided May 19, 1902.

The trial of an officer of volunteers by a court-martial, all the members of which were officers of the Regular Army, is illegal, and the objection to it could be taken on *habeas corpus.*

A PETITION for a writ of *habeas corpus* was presented to the Circuit Court of the United States for the District of Kansas, First Division, asking that Peter C. Deming, once a captain in the subsistence department of the Volunteer Army of the United States, might be produced by Robert W. McClaughry, the appellant herein, in whose custody Deming was placed, McClaughry being the warden of the United States prison at Fort Leavenworth, Kansas.

On the part of Deming it was shown in the petition that he was imprisoned and restrained by virtue of a sentence imposed upon him by a general court-martial of the United States, convened at the Presidio of San Francisco, California, by William R. Shafter, Major General, United States Volunteers, and Brigadier General of the United States Army, retired, being of the age of 64 years. The sentence imposed upon Deming by the court-martial was that he should be dismissed from the service of the United States, and be confined in such penitentiary as the reviewing authority might direct for the period of three years, and that the crime, punishment, name and place of abode of the accused should be published in the newspapers in and about the city of San Francisco, and in the State where the accused usually resided. The sentence was approved by the Secretary of War and affirmed by the President of the United States on June 8, 1900.

The petition further showed that the court-martial which imposed the sentence was convened by virtue of the following order:

"Special Orders, ⎱ Headquarters Department of California,
    No. 65. ⎰     San Francisco, Cal., March 29, 1900.

"7. A general court-martial is appointed to meet at the Presidio of San Francisco, California, at 11 o'clock A. M., on Tuesday, the 3d proximo, or as soon thereafter as practicable, for the trial of Captain Peter C. Deming, assistant commissary of subsistence, U. S. Volunteers.

"Detail for the court:

"Colonel Jacob B. Rawles, 3d Artillery.

"Lieutenant Colonel Richard I. Eskridge, 23d Infantry.

"Major Louis H. Rucker, 6th Cavalry.

"Major Benjamin C. Lockwood, 21st Infantry.

"Captain Frank West, 6th Cavalry.

"Captain Carber Howland, 4th Infantry.

"Captain Sedgwick Pratt, 3d Artillery.

"Captain Henry C. Danes, 3d Artillery.

"Captain Charles A. Bennett, 3d Artillery.

"Major Stephen W. Groesbeck, judge advocate, U. S. Army, judge advocate.

[SEAL.]

"The court is empowered to proceed with the business before it with any number of members present not less than the minimum prescribed by law, the above being the greatest number that can be convened without manifest injury to the service.

"Such journeys as Colonel Rawles, Major Groesbeck, and Captain Pratt may be required to make between their respective stations and the Presidio of San Francisco, in attending the meetings of the court, are necessary for the public service.

"By command of Major General Shafter: -

                "J. B. BABCOCK,
              "*Assistant Adjutant General.*"

It was further shown in the petition that Deming was an officer in the Volunteer Army and forces of the United States, and that the members of the court-martial above named, and who tried him, were all officers in the Regular Army, and it was averred that he could not legally or lawfully be tried by a court-

martial composed of such officers, because it would be in direct violation of the seventy-seventh article of war, section 1342, Revised Statutes of the United States, which reads as follows:

" Article 77. Officers of the Regular Army shall not be competent to sit on courts-martial, to try the officers or soldiers of other forces, except as provided in article 78.

" Article 78. Officers of the Marine Corps, detached for service with the Army by order of the President, may be associated with officers of the Regular Army on courts-martial for the trial of an offender belonging to the Regular Army, or to forces of the Marine Corps so detached; and in such cases the orders of the senior officer of either corps, who may be present, and duly authorized, shall be obeyed."

It was further averred in the petition that Deming was tried and convicted without due process of law and in violation of the Fifth Amendment of the Constitution of the United States; that the court-martial was an illegal one and without warrant of law, and the sentence imposed upon Deming was without warrant or authority of law, illegal and void. A writ of *habeas corpus* was prayed for, to be directed to the warden, commanding him to have the body of Deming before the court. This petition was sworn to in behalf of Deming by the petitioner J. H. Atwood.

Upon that petition the writ issued, and the warden, in compliance therewith produced Deming and made return to the writ in substance, as follows: That William R. Shafter was a major general of volunteers, exercising command of the Department of California, by virtue of an assignment of the President of the United States, as Commander-in-Chief of the Army; that on March 29, 1900, pursuant to authority and in conformity with the provisions of article 72 of the articles of war, General Shafter appointed a general court-martial, by special orders, to meet at the Presidio of San Francisco on April 3, 1900, or as soon thereafter as practicable, for the trial of Peter C. Deming, assistant commissary of subsistence, United States Volunteers, the detail of which court-martial was then stated, and which was the same as that already mentioned in the order convening the court. It was admitted that all the members of the court-

martial so detailed were members of the Regular Army; that on April 5, 1900, the court proceeded to the trial of Deming, who, being present in court, the order convening the court was read to him, and he was asked if he objected to being tried by any member present named in the order convening the court, to which he replied in the negative. The members of the court and the judge advocate were then duly sworn, the court adjourning to meet again on April 23, 1900, at which time all the members of the court were present, and the judge advocate and Deming, the accused, with counsel. The accused was then arraigned upon charges of embezzling public money of the United States in violation of the sixtieth article of war, and conduct unbecoming an officer and a gentleman in violation of the sixty-first article of war; that thereupon Deming pleaded guilty, and the court-martial then passed sentence upon him, which was set forth in the return, and has been already stated.

The return further stated that on May 2, 1900, the proceedings, findings and sentence of the court-martial were approved by Major General Shafter, and submitted for the action of the President pursuant to the provisions of article 106 of the articles of war, and that thereafter on June 8, 1900, the sentence was confirmed by the President of the United States, and on that day, by direction of the Secretary of War, Deming ceased to be an officer of the Army of the United States, and the penitentiary at Fort Leavenworth, Kansas, was designated as the place for his confinement.

A certified copy of the record and proceedings of the court-martial, duly authenticated under the laws of the United States, together with a copy of the order for the court-martial, the proceedings, finding and sentence in the case, were attached to the return of the warden, and made a part of it.

The facts above detailed also appear in the record of the court-martial.

The petitioner demurred to the return as not stating facts sufficient to warrant the detention of the petitioner in custody, nor to warrant the refusal of the writ of *habeas corpus*, prayed for in the petition, and because such facts did not give the warden any legal right to deprive Deming of his liberty.

Although it does not appear distinctly in the record, yet it is conceded that upon the argument before the District Judge the writ was discharged and the prisoner remanded to the custody of the warden, and that upon appeal to the Circuit Court of Appeals that court reversed the order of the Circuit Court, and directed that the writ issue and that Deming be discharged from custody. Thereafter, in accordance with the judgment of the Circuit Court of Appeals, Deming was discharged by the Circuit Court, and from the order of the court so discharging him the Government has appealed to this court.

*Mr. E. P. Crowder* for appellant.

*Mr. James H. Hayden* for appellee.

MR. JUSTICE PECKHAM, after stating the foregoing facts, delivered the opinion of the court.

The grave question in this case relates to the power of an officer convening a court-martial for the trial of an officer of volunteers, to compose that court entirely of officers of the Regular Army. It is claimed on the part of the respondent herein that a volunteer officer could not be legally tried by such a court, and that to convene and constitute a court-martial so composed, for the trial of a volunteer officer, was a violation of the seventy-seventh article of war, above set forth.

The Circuit Court of Appeals for the Eighth Circuit held, in a very clear and satisfactory opinion, 113 Fed. Rep. 639, that the trial of Deming by a court-martial, all the members of which were officers of the Regular Army, was illegal, and that the objection could be taken on *habeas corpus*. The reasoning of the opinion leaves little to add further than to state our concurrence therein. As the case is one of considerable importance in its results, it is, however, proper that we should ourselves state the reasons which lead us to the conclusion that the order appealed from was right, and should be affirmed.

The Government seeks a review of the decision of the court below, upon the strength of three propositions, argued by its

counsel, upon one or all of which a reversal of the decision of that court is sought. These propositions are as follows:

(1) That the Volunteer Army of 1899, of which Deming was an officer at the time of his trial, conviction and sentence, was not " other forces " within the meaning of article 77 of the articles of war.

(2) That even if Deming were to be treated as an officer of " other forces," within the meaning of that article, the fact would not deprive the court-martial of regular officers who tried him, of jurisdiction; this article relating entirely to the competency of members of a court-martial, not at all to its jurisdiction.

(3) The court-martial having jurisdiction and acting within its powers, its proceedings cannot be assailed by *habeas corpus*.

Taking these propositions in the order named, we are brought to the consideration of the meaning and application of the seventy-seventh article of section 1342 of the Revised Statutes of the United States, (page 237,) commonly called the articles of war. Article 78 has no application to this case, which rests upon the proper construction of article 77. The reading of the latter article shows that the existence of other forces than those of the Regular Army is contemplated. When a volunteer force is spoken of as well as a regular army force, in the statutes of the United States, such force would seem to come within the description of some other force than that of the Regular Army. But the claim is made on the part of the Government that by virtue of the act of Congress of April 22, 1898, 30 Stat. 361, and particularly that of March 2, 1899, 30 Stat. 977, the officers of the Volunteer Army of the United States are not properly described by the words " other forces," within the meaning of the seventy-seventh article of war.

It is said that while the course of legislation prior to the passage of the acts above mentioned showed a clear distinction between the militia or volunteer forces and the Regular Army of the United States, the acts referred to, and especially that of 1899, changed the status of the volunteer forces enlisted under them, and, so far as the seventy-seventh article of war is concerned, rendered such force, in reality, the same in substance

as the forces of the Regular Army, and not "other forces" of the country. We think this claim is unfounded, and that the distinction still exists within the meaning of the article.

The seventy-seventh article of war as enacted in 1874 was but a substantial continuation of provisions, found in various acts of Congress from the foundation of the Government. In September of the year 1776 the Continental Congress enacted what is termed the military code of that year. In that code is to be found section 17, article 1, which reads as follows:

"SEC. 17, ART. 1. The officers and soldiers of any troops, whether minute men, militia, or others, being mustered and in continental pay, shall, at all times, and in all places, when joined, or acting in conjunction with the regular forces of the United States, be governed by these rules or articles of war, and shall be subject to be tried by courts-martial in like manner with the officers and soldiers in the regular forces; save only that such courts-martial shall be composed entirely of militia officers of the same provincial corps with the offender.

"That such militia and minute men as are now in service, and have, by particular contract with the respective States, engaged to be governed by particular regulations while in continental service, shall not be subject to the above articles of war." Winthrop's Military Law and Precedents, vol. 2, p. 1501.

From the text of this section it is argued on the part of the Government that the purpose of its passage was not to guard against the feeling of jealousy and distrust with which the professional soldier was regarded, as was stated by the court below, because, as the Government claims, the regular forces of the Revolutionary War period were not made up of professional soldiers, and also because the article provided not only that the trials of militiamen should be before courts-martial composed entirely of militia officers, but that such officers should be of the same provincial corps with the offender. All this language, it is claimed, was but an expression in military legislation of the politi  doctrine, generally urged at that time in extreme form, that each State should be to the greatest extent practicable self-governing.

We think, however, there was, in addition to the idea of state control over the troops from a State, a recognition of the fact that there was a substantial difference between the regular forces and the militia. There was a recognition of the undoubted fact that at all times there has been a tendency on the part of the regular, whether officer or private, to regard with a good deal of reserve, to say the least, the men composing the militia as a branch not quite up to the standard of the Regular Army, either in knowledge of martial matters or in effectiveness of discipline, and it can be readily seen that there might naturally be apt to exist a feeling among the militia that they would not be as likely to receive what they would think to be as fair treatment from regulars, as from members of their own force. The reasons for the feeling are set forth fully in the opinion below, and we think quite correctly. It is most probable that Congress recognized all these reasons in its earliest legislation upon the subject as considerations upon which that legislation was founded.

This military code with the above-mentioned section remained in force during the War of the Revolution and until 1806. Various acts were passed in the meantime providing for calling the militia into active service, and the acceptance of volunteers was also authorized by the acts of March 3, 1791, section 8, 1 Stat. 222, 223, and by that of May 28, 1798, 1 Stat. 558, but as stated by counsel for the Government, none of the organizations of volunteers authorized by the legislation was actually received into the service of the General Government and organized as United States troops.

By the act of April 10, 1806, 2 Stat. 359, Congress established rules and articles for the government of the Army of the United States. Among them is the following:

" ART. 97. The officers and soldiers of any troops, whether militia or others, being mustered and in pay of the United States, shall, at all times and in all places, when joined, or acting in conjunction with the regular forces of the United States, be governed by these rules and articles of war, and shall be subject to be tried by the court-martial in like manner with the officers

and soldiers in the regular forces, save only that such court-martial shall be composed entirely of militia officers."

This section, it will be observed, leaves out the words " of the same provincial corps with the offender," which are contained in section 17 of the Military Code of 1776, above set forth, thus leaving the militia to be tried by courts-martial the members of which shall be composed entirely of militia officers. While the provision that the courts-martial should be composed of militia officers of the same provincial corps with the offender was left out, the other provision that the courts should be composed entirely of militia officers was retained. This legislation still recognized the difference between the militia and the regular forces, and provided for the trial of militia offenders by militia officers, while at the same time the restriction that such officer should be of the same provincial corps with the offender was stricken out, thus showing that of the two ideas, the one which recognized the general ground of distinction between the regular and the militia forces was stronger than that which restricted the trial of a member of the militia to courts-martial composed of the same provincial corps.

While it may be that there was then no particular distrust or jealousy of the Regular Army, the provision in question recognized, as we have said, the difference there was between the two bodies, the regulars and the militia or volunteers, and Congress still thought it proper to provide that those composing the latter force should not be tried by officers of the former. It was not jealousy or distrust of the Regular Army which led to the enactment ; it was the radical difference existing between the two forces which made it proper to provide that regular officers should not sit in courts-martial to try offenders in the volunteer forces.

History shows that no militia, when first called into active service, has ever been equal to a like number of regular troops. It is not that the men composing the militia force are less brave or less intelligent, but they lack actual experience which the regulars have, and it is that fact which gives the regulars the feeling of superiority, and it is that feeling which is recognized by Congress and which has resulted in legislation of this character.

Further distinctions between the two forces are very well stated in the opinion of the Circuit Court of Appeals in this case.

This section 97 of the act of 1806 continued in force until the revision of the law in 1874. During this time the war of 1812, the Seminole war, the Mexican war and the Civil war were all carried on. During the Civil war the volunteer troops, called for under the first proclamation of the President, came primarily as state troops, and the general orders of the War Department provided for the appointment of all field and company officers by the governors of the States who were to commission them. The same provisions in substance were contained in the subsequent acts of 1861. See acts of July 22, 1861, 12 Stat. 268 ; and August 6, 1861, chapter 75, sec. 3, 12 Stat. 317.

The statute of July 22, 1861, which provided that when vacancies occurred in any of the volunteer organizations received into the service under that act, they should be filled by election, and that the officers so elected should be commissioned by the respective governors of the States, or by the President of the United States, was amended by the act of August 6, 1861, which provided for the appointment and commissioning of officers of volunteers exclusively by the governors of the States furnishing the same.

The question of the meaning of the ninety-seventh article of war, with reference to the volunteer forces of the Civil war, was presented to Judge Advocate General Holt, who, on November 19, 1863, in an opinion, expressed himself as follows: " The words ' militia officers,' as employed in the ninety-seventh article of war, have been interpreted since the commencement of the rebellion as synonymous, as far as the organization of courts-martial is concerned, with volunteer officers. This construction undoubtedly accords with the spirit of the article, and in its practical enforcement the object of the rule is accomplished," the object of the rule being that members of the volunteer forces of the Army at that time should be tried only by courts-martial composed of volunteer officers.

The intent of the legislation of 1874 was simply to preserve the rule which had existed from the formation of the Govern-

ment, and to keep up the distinction between the Regular Army and the volunteer forces, so far as to maintain the practice of trying volunteers by volunteer officers. The question was not so much how the volunteer or "other forces" came into the service of the Government, whether under officers appointed and commissioned by governors of their States, or by direct enlistment as volunteers, to aid the Government, but whether they were in fact volunteers and not members of the Regular Army. If they were volunteers, the same reasons for not being tried by regular army officers were present, whether they first volunteered through the State, and were then mustered into the service of the Government, or entered directly into that service, for in both cases they were volunteers and were not members of the Regular Army.

The acts of Congress of 1898, 30 Stat. 361, and of 1899, 30 Stat. 977, show conclusively, as we think, that the distinction was kept up and in the mind of Congress between the Regular Army and the Volunteer Army of the United States, and the declaration of section 2 of the act of 1898, which provides that in time of war the Army shall consist of two branches, which shall be designated respectively as the Regular Army and the Volunteer Army of the United States, is a plain recognition by Congress of the difference between the two forces. We cannot read the various provisions of these two acts of Congress without being brought to the conclusion that they contemplated and particularly provided for the existence of other forces than that of the Regular Army. The Volunteer Army was one of such other forces, and also the militia when in active service of the United States, and the Marine Corps when detached and placed upon duty with th  Army by order of the President. The volunteer force is cei·  ·lv not the regular force or army, and if not, it must be so.      ?r force, and if so, its members cannot be tried by office?      ˙he regular force or army. The act of 1899 does not assuɪ  to repeal that of 1898, excepting some specific provisions thereof, such as are mentioned in section eleven of the act of 1899. The balance of the earlier act remains in force, except as to any provision which may be in conflict with the act of 1899. Upon this

particular matter of a distinction between the Regular Army and the Volunteer Army, there is no inconsistency between the two acts, and therefore the act of 1898 on that subject remains in connection with that of 1899.

It would unduly lengthen this opinion to cite the various sections of the two acts which provide for and prove this difference. It was done with much detail by the Judge who wrote the opinion in the Circuit Court of Appeals when this case was before that court, and we refer to that opinion for those details which in our judgment are controlling proof that the volunteer officers and men constitute other forces than the Regular Army within the meaning of the seventy-seventh article of war.

Section 14 of the act of 1898 seems to us particularly significant of the desire of Congress to recognize and keep up the distinction between these various forces of the Army of the United States. It proves its purpose to keep the interests of the volunteer troops particularly in mind, and that they should be looked after by members of their own body. It is therein provided that a general commanding a separate department or a detached army shall have authority to appoint military boards of not less than three nor more than five of the volunteer officers of the Volunteer Army to examine into the capacity, conduct and efficiency of any commissioned officer of that army within his command. They were to be not only officers of the Volunteer Army, but were themselves to be volunteer officers. This section of the act of 1898 has never been repealed and is not in conflict with any part of the act of 1899. Although the volunteer troops organized under the last act of Congress were mustered directly into the service of the United States without regard to st e or territory lines, yet the very provisions of both thes ts with regard to volunteers show that they were org s volunteers for a temporary purpose only and did not for: part of the force of the Regular Army. The same reasons which have existed since the formation of the Government for prohibiting trials of such men by courts-martial composed of regular army officers exist under these acts. The seventy-seventh article of war by its terms covers such a case. It has not been repealed or amended. The reasons

for its enactment still remain as strong as when it was first adopted, and we think it covers the case of this officer who belongs to the Volunteer Army, raised under the act of 1899 and who was tried by a court-martial composed of regular army officers in violation of the act of Congress in that behalf. Congress could, of course, legislate for and temporarily enlarge the Regular Army, and the troops so enlisted for such Regular Army would be regular troops, notwithstanding they might be enlisted only for the term of the duration of a war then imminent or actually existing. Such was the act of February 11, 1847, 9 Stat. 123, in regard to the war with Mexico. But that has no material bearing upon the proposition that troops not so enlisted but on the contrary enlisted simply and in terms as volunteers, would not be troops of the Regular Army, but would be what they purport to be, volunteers, a separate branch from the regulars, and constituting by the terms of the statute other forces than such regulars.

The mere fact of a direct enlistment of the volunteers into the service of the United States under the act of 1899 cannot, as we have said, change the essential character of the Volunteer Army as a different and separate force from that of the Regular Army.

By the act of February 24, 1864, 13 Stat. 6, sec. 24, it was provided (section 24):

"That all able-bodied male colored persons, between the ages of twenty and forty-five years, resident in the United States, shall be enrolled according to the provisions of this act, and of the act to which this is an amendment, and form part of the national forces.

\*          \*          \*          \*          \*          \*          \*          \*

"But men of color, drafted or enlisted, or who may volunteer into the military service, while they shall be credited on the quotas of the several States, or subdivisions of States, wherein they are respectively drafted, enlisted or shall volunteer, shall not be assigned as state troops, but shall be mustered into regiments or companies as United States colored troops."

Here was a case where the colored troops were mustered directly into regiments or companies as United States (colored)

troops, although credited on the quotas of the several States. They became United States troops, yet were not part of the Regular Army of the United States.

The Judge Advocate of the Army on December 16, 1864, rendered an opinion as to the composition of courts-martial for the trial of officers and soldiers in the Veteran Reserve Corps and United States colored troops, in which he used this language:

"In the absence of any statute law which either designates officers of the Veteran Reserve Corps or of the United States colored troops as regulars in express terms, or by a necessary implication from its provisions, fixes upon them this status, the Secretary of War has not proceeded to so characterize them, and until he shall do so these officers should, so far as the composition of courts-martial is concerned, be regarded as a part of the volunteer force."

Without some statute, otherwise providing therefor, the Judge Advocate General was of opinion that those forces should be regarded as a part of the volunteer forces unless the Secretary of War otherwise characterized them. Whether that official had power to do so need not now be inquired into, but unless he did so the Judge Advocate General thought that the United States colored troops were to be regarded as a part of the volunteer forces.

We conclude that the acts of 1898 and 1899 still left the Volunteer Army as a separate or other force from the Regular Army of the United States.

The second proposition argued by counsel for the Government we cannot agree to. If the defendant were a member of one of the "other forces," named in the seventy-seventh article of war, a court-martial, solely convened for the purpose of trying him, composed entirely of regular officers, would not have jurisdiction. Such a body would have jurisdiction over neither the subject-matter nor the person. A court-martial is the creature of statute, and, as a body or tribunal, it must be convened and constituted in entire conformity with the provisions of the statute, or else it is without jurisdiction. It was said by Mr. Chief Justice Waite in *Runkle* v. *United States*, 122 U. S. 543, 555:

"A court-martial organized under the laws of the United States is a court of special and limited jurisdiction. It is called into existence for a special purpose and to perform a particular duty. When the object of its creation has been accomplished, it is dissolved. 3 Greenl. Ev. sec. 470; *Brooks* v. *Adams*, 11 Pick. 441, 442; *Mills* v. *Martin, supra; Duffield* v. *Smith*, 3 S. & R. 590, 599. Such, also, is the effect of the decision of this court, in *Wise* v. *Withers*, 3 Cranch, 331, which, according to the interpretation given it by Chief Justice Marshall in *Ex parte Watkins*, 3 Pet. 193, 209, ranked a court-martial as 'one of those inferior courts of limited jurisdiction whose judgments may be questioned collaterally.' To give effect to its sentences it must appear affirmatively and unequivocally that the court was legally constituted; that it had jurisdiction; that all the statutory regulations governing its proceedings had been complied with, and that its sentence was conformable to law. *Dynes* v. *Hoover*, 20 How. 65, 80; *Mills* v. *Martin*, 19 Johns. 33. There are no presumptions in its favor, so far as these matters are concerned. As to them, the rule announced by Chief Justice Marshall in *Brown* v. *Keene*, 8 Pet. 112, 115, in respect to averments of jurisdiction in the courts of the United States, applies. His language is: 'The decisions of this court require that averment of jurisdiction shall be positive—that the declaration shall state expressly the fact on which jurisdiction depends. It is not sufficient that jurisdiction may be inferred, argumentatively, from its averments.' All this is equally true of the proceedings of courts-martial. Their authority is statutory, and the statute under which they proceed must be followed throughout. The fact necessary to show their jurisdiction, and that their sentences' were conformable to law, must be stated positively; and it is not enough that they may be inferred argumentatively."

What jurisdiction can a court-martial have which is composed of officers incompetent to sit on such court, of officers who are placed there in direct and plain violation of the act of Congress? This particular court was convened for the sole purpose of trying an officer of the Volunteer Army, and it was composed under the orders of the officer convening it of members each

and all of whom where prohibited by law from sitting on such court. As to the officer to be tried there was no court, for it seems to us that it cannot be contended that men, not one of whom is authorized by law to sit, but on the contrary all of whom are forbidden to sit, can constitute a legal court-martial because detailed to act as such court by an officer who in making such detail acted contrary to and in complete violation of law. Where does such a court obtain jurisdiction to perform a single official function? How does it get jurisdiction over any subject-matter or over the person of any individual? The particular tribunal is a mere creature of the statute, as we have said, and must be created under its provisions. It is a special body convened for a specific purpose, and when that purpose is accomplished its duties are concluded and the court is dissolved. The officers composing the alleged court were not *de facto* officers thereof, for there was no court, and therefore it could not have *de facto* officers. *Norton* v. *Shelby County*, 118 U. S. 425, 441. The attempt at the creation of a court failed because such attempt was a plain violation of the statute. A court-martial is wholly unlike the case of a permanent court created by constitution or by statute and presided over by one who had some color of authority although not in truth an officer *de jure*, and whose acts as a judge of such court may be valid where the public is concerned. The court exists even though the judge may be disqualified or not lawfully appointed or elected. But in this case the very power which appointed the members of and convened the court violated the statute in composing that court. It is one act, appointing the members of and convening the court, and in performing that act the officer plainly violated the law. Is such a court a valid court and the members thus detailed *de facto* officers of such valid court? Clearly not.

It is urged, however, that the seventy-seventh article of war contains no reference to the jurisdiction of courts-martial; that it merely provides that certain officers shall not be competent to sit on such courts to try certain offenders, and that the jurisdiction of the court to hear and decide is regulated by other articles. But the court-martial that has jurisdiction over any

offence must, in the first place, be legally created and convened. Such a court is not a continuous one, created by the statute itself and filled from time to time by appointments of certain members under the power given by statute. The court has no continuous existence, but under the provisions of the statute it is called into being by the proper officer, who constitutes the court itself by the very act of appointing its members, and when in appointing such members he violates the statute, as in this case, by appointing men to compose the court that the statute says he shall not appoint, the body thus convened is not a legal court-martial and has no jurisdiction over either the subject-matter of the charges against a volunteer officer or over the person of such officer. The act of constituting the court is inseparable from the act which details the officers to constitute it. It is one act, and the court can have no existence outside of and separate from the officers detailed to compose it. By the violation of the law the body lacked any statutory authority for its existence, and it lacked, therefore, all jurisdiction over the defendant or the subject-matter of the charges against him. It is said, in *Keyes* v. *United States*, 109 U. S. 336, that where the statutory conditions as to the constitution or jurisdiction of the court are not observed, there is no tribunal authorized by law to render the judgment.

Within the *Runkle case, supra,* this particular court was not legally constituted to perform the function for which alone it was convened. It was therefore in law no court. The men were disqualified to act as members thereof, and no challenge was necessary, for there was no court to hear and dispose of the challenge. It is unlike an officer who might be the subject of challenge as under some bias. A failure to challenge in such a case might very well be held to waive the defect, and the officer could sit and the finding of the court be legal. But this is not the case of a personal challenge of some member of the court where an objection to his sitting might be thus particularly raised. It is an objection that the whole court as a court was illegally constituted because in violation of the express provision of the statute, and the challenge to the whole court is not provided for by the statute.

But it is said defendant did not object to being tried by this illegally constituted court, and that his consent waived the question of invalidity. We are not of that opinion. It was not a mere consent to waive some statutory provision in his favor which, if waived, permitted the court to proceed. His consent could no more give jurisdiction to the court, either over the subject-matter or over his person, than if it had been composed of a like number of civilians or of women. The fundamental difficulty lies in the fact that the court was constituted in direct violation of the statute, and no consent could confer jurisdiction over the person of the defendant or over the subject-matter of the accusation, because to take such jurisdiction would constitute a plain violation of law. His consent had no effect whatever in the face of the statute which prevented such men sitting on the court. The law said such a court shall not be constituted, and the defendant cannot say it may, and consent to be tried by it, any more than he could consent to be tried by the first half a dozen private soldiers he should meet; and the decision of neither tribunal would be validated by the consent of the person submitting to such trial.

*Kohl* v. *Lehlback*, 160 U. S. 293, was a criminal case, and it was held that in New Jersey the alienage of a juror participating in a trial was a subject of challenge when he was called; that it was for the state court to decide whether the verdict of conviction should be set aside on his motion when the accused did not interpose such challenge when the juror was drawn. The principle of that case does not apply here. It was an objection to a single juror, and was ground for a personal challenge. The presence of an alien on the jury did not render the court an illegal one, had no effect upon its jurisdiction over the person of the defendant or the subject-matter of the indictment, and therefore did not render the trial a nullity. The case at bar differs in all these facts, and the court, having been illegally constituted, had no jurisdiction to try the offender for any offence whatever, even with his consent.

It may also be said that the disqualification of a particular juror is brought before the court by a challenge in regard to the decision of which the juror takes no part. In this case no

provision having been made for a challenge to the whole court, the challenge must have been to each member thereof, separately, and the officers to try the challenge would have to decide a question existing in the case of each of such officers precisely to the same extent that was presented in the case of the officer challenged, so that in effect each would be passing upon a challenge in his own case. We do not say that this fact alone creates the difference between the two cases. The material and all pervading fact constituting that difference is that the whole court is in the one case constituted in utter violation of the command of the statute, while in the case cited the court was legal, had jurisdiction over the subject-matter and over the person, and the sitting of one disqualified juror being a cause of personal challenge is waived by the failure to interpose it.

There are some cases cited by counsel for the Government where disqualified judges sat in violation of the statute, such as *Pettigrew* v. *Washington County*, 43 Ark. 33; *Fowler* v. *Brooks*, 64 N. H. 423; *Crozier* v. *Goodwin*, 1 Lea (Tenn.), 368; *Holmes* v. *Eason*, 8 Lea (Tenn.), 754; *Wilson* v. *Smith*, 38 S. W. Rep. (Ky.) 870.

On the other hand, there is the case of *Oakley* v. *Aspinwall*, 3 N. Y. 547, where it was held that a judge who was disqualified to sit in a cause by reason of consanguinity to one of the parties could not sit even by consent of both parties, and if he did the judgment in regard to which he took part would be vacated. In that case it was said (page 552):

"It was, however, urged at the bar, that although the judge were wanting in authority to sit and take part in the decision of this cause, yet, that having done so at the solicitation of the respondent's counsel, such consent warranted the judge in acting, and is an answer to this motion. But where no jurisdiction exists by law it cannot be conferred by consent—especially against the prohibition of a law—which was not designed merely for the protection of the party to a suit, but for the general interests of justice. *Low* v. *Rice*, 8 Johns. 409; *Clayton* v. *Per Dun*, 13 Id. 218; *Edwards* v. *Russell*, 21 Wend. 63; 21 Pick. 101. It is the design of the law to maintain the purity and impartiality of the courts, and to insure for their decisions the

respect and confidence of the community. Their judgments become precedents which control the determination of subsequent cases; and it is important, in that respect; that their decisions should be free from all bias. After securing wisdom and impartiality in their judgments, it is of great importance that the courts should be free from reproach or the suspicion of unfairness. The party may be interested only that his peculiar suit should be justly determined; but the State, the community, is concerned not only for that, but that the judiciary shall enjoy an elevated rank in the estimation of mankind."

A judge, who is prohibited from sitting by the plain directions of the law, cannot sit, and the consent that he shall sit gives no jurisdiction. This is the doctrine of above case. It has been followed without doubt or hesitation in the State of New York ever since its rendition in 1850. *People* v. *Connor*, 142 N. Y. 130, is among the latest of the cases on that subject. See, also, *Sigourney* v. *Sibley*, 21 Pick. 101, 106; *Gay* v. *Minot*, 3 Cush. 352; *Hall* v. *Thayer*, 105 Mass. 219, 224; *Chicago & Atlantic Railway Co.* v. *Summers*, 113 Ind. 10, 17.

It is difficult for us to understand how an ephemeral court, composed of men detailed as members, each one of whom is so detailed in direct violation of the statute on that subject which prohibits their sitting, can obtain any jurisdiction over the subject-matter or person even by the consent of the defendant. In those cases where the judgment rendered by a disqualified judge was held free from attack because of a waiver, it can at least be said there was a valid court for other purposes than the trial or hearing of the particular case, and that the objection was simply a personal one, and should be made before the trial or it must be deemed waived. We are not inclined to that view, but the principle is not applicable to this case where the court is created and all the members of it are convened in total disregard and violation of the statutes upon the subject of its membership.

(3) We are also of opinion that the invalidity of the court-martial can be raised upon a hearing on *habeas corpus*. The judgment, even after the approval of the officers, provided for by statute, is that of a court of limited jurisdiction only, whose

judgments may be attacked collaterally.   In explaining the decision of *Wise* v. *Withers*, 3 Cranch, 331, where he had himself written the opinion, Chief Justice Marshall said in *Ex parte Watkins*, 3 Pet. 193, 209, that it had been considered in the former case that a court-martial was one of those inferior courts of limited jurisdiction, whose jurisdiction might be questioned collaterally.   In order to give effect to the judgment of a court of that nature it must appear affirmatively that the court was legally constituted; that it had jurisdiction, and that all of the statutory requirements governing its proceedings had been complied with.   *Runkle case, supra.*   Jurisdiction of inferior courts not of record must be affirmatively shown and no presumption thereof exists.   Freeman on Judgments, 3d ed. sec. 517.   They can, therefore, be attacked collaterally.

While the writ of *habeas corpus* cannot be converted into a writ of error, yet unless the court which tried the prisoner has jurisdiction to try and punish him for the offence the prisoner may be discharged on such writ.   *In re Coy*, 127 U. S. 731, 757.

The question we are now discussing resolves itself into one of jurisdiction simply.   If the court-martial had jurisdiction over the subject-matter of the charge against the defendant and of the person, or if the consent of the defendant gave such jurisdiction, the writ of *habeas corpus* will afford no relief, for generally, in such case any error committed by a court-martial regularly organized and with full jurisdiction is not assailable before the civil courts.   *Swaim* v. *United States*, 165 U. S. 553; *Carter.* v. *McClaughry*, 183 U. S. 365.

For the reasons already given, we think the court was illegally constituted, in violation of law, and that it had no jurisdiction over the person of the defendant or the subject-matter of the charges against him, and that consent could confer none in opposition to the statutory requirements for members of a court-martial convened to try him.

The question of who shall act on courts-martial for the trial of offenders belonging to the various branches of the Army of the United States is one entirely for Congress to determine.   If it should think the time has come to do away with the distinc-

tion between the volunteer or militia force and the Regular Army, it rests in its discretion to so provide.

We are of opinion, after a careful examination of this record, that the decision of the court below was right, and the order discharging the defendant from custody should be

*Affirmed.*

THE CHIEF JUSTICE and MR. JUSTICE McKENNA dissented.

MR. JUSTICE GRAY and MR. JUSTICE BREWER did not hear the argument and took no part in the decision.