McCUNE v. KILPATRICK, Commanding Officer of Hampton Roads Port of Embarkation, et al.

No. M–6933.

District Court, E. D. Virginia, Norfolk Division.

Dec. 28, 1943.

C. Dodson Morrisette, of Norfolk, Va., for petitioner.

Sterling Hutcheson, U. S. Atty., of Richmond, Va., Russell T. Bradford, Asst. U. S. Atty., of Norfolk, Va., General Myron C. Cramer, The Judge Advocate General, U. S. Army, Colonel Archibald King, J. A. G. D., U. S. Army, and Captain F. Gordon Hudgins, Transportation Corps, U. S. Army, all of Washington, D. C., Tom C. Clark, Asst. Atty. Gen., and Sheldon E. Bernstein, Department of Justice, of Washington, D. C., for respondents.

WYCHE, District Judge (sitting by special designation).

This is an application for a writ of habeas corpus filed by a prisoner in the military stockade at Camp Patrick Henry, Virginia, to obtain his release. He is being held awaiting trial by a general court-martial of the United States Army on a charge of desertion.

There seems to be little dispute as to the facts, which I find to be as follows:

The petitioner, Lawrence Elroy McCune, a veteran of the last world war, having served with the American Expeditionary Forces, and honorably discharged, is, and has been, a seafaring man, a steward and chief cook, for the past twenty years. As a member of the Seafarer's International Union of North America, he was on September 22, 1943, in the Norfolk, Virginia, hall of the union seeking employment. The local representative of the union had received a call from Taylor and Andrews, Inc., Norfolk representatives of the Mississippi Shipping Company, which operates the Steamship Thomas B. Robertson, under contract with the United States Government, for seamen and a chief cook to complete the crew of the vessel. In conformity with the custom, notice of this call was posted on the bulletin board in the union hall, and McCune, upon observing the notice, manifested a desire to be employed as chief cook, and was, according to custom, issued duplicate certificates by the union to identify him to the vessel, and in the late afternoon of said date, reported aboard the ship, which was then docked at Pier 2 of the Army Base at Norfolk, Virginia.

The following day, September 23, 1943, he assumed his duties of preparing three meals each day for the crew of the vessel, seventy-eight in number, including a gun crew of twenty-nine. The gun crew was made up of enlisted personnel and one officer of the United States Navy.

The next day, September 24, 1943, McCune left the vessel early in the morning, reported to the United States Shipping Commissioner's office in Norfolk, Virginia, and signed articles of agreement [1] with Carl I. Stevens, master of the vessel, on the usual printed form, to which was added the following, as to the destination of the voyage, and the duration of the petitioner's employment: "Now bound from the port of Norfolk, Virginia, a point in the Atlantic Ocean to the eastward of Norfolk, Virginia, and thence to such ports and places in any port of the world as the Master may direct or as may be ordered or directed by the United States Government, or any Department, Commission or Agency thereof, and back to a final port of discharge in the United States, for a term not exceeding twelve calendar months." Late in the afternoon of the same day he reported back aboard the vessel. From then until the afternoon of Saturday, October 2, 1943, McCune performed his duties as chief cook.

McCune was advised by the Chief Steward on the morning of October 2nd that troops were coming aboard, and he would have to prepare meals for them. He inquired, "Why is the A. T. S. sending troops down here?" And told the Steward that he signed as a merchant cook, not as a transport cook. On the afternoon of October 2, 1943, approximately five hundred soldiers boarded the vessel, and McCune was ordered by the Chief Steward

---

[1] The title to the agreement is as follows:

United States Coast Guard
Shipping Articles

(R.S.. 4612, as amended—U.S.C., title 46, sec. 713 [46 U.S.C.A. § 713])

Articles of Agreement between Master and Seamen in the Merchant Service of the United States.

Required by Act of Congress, Title LIII, Revised Statutes of the United States (U.S.C., title 46, chap. 18 [46 U.S.C.A. § 541 et seq.])

to prepare supper for the troops as well as for the crew of the vessel, which he did, without further protest at that time.

Supper for the soldiers having been prepared, and ready to be served, supper for the crew not having been completed, McCune reported this fact to a Major then in charge of the army troops, and told him: "You will have to go and eat over here (designating tables for the officers) so I can get through and clear the galley on the top side." To which the Major replied: "There isn't anybody going to eat until the Colonel eats." Whereupon McCune said: "If the army is going to take this over, and not eat when it is ready, I am going to get off the ship." McCune then asked the master of the vessel for his discharge. He told the master to give him a discharge, and he would get off the ship, that he was not riding it if the army was going to take it over, because he could not do the work. The master replied he had to move his ship, and did not issue the discharge, whereupon McCune packed some of his clothes, threw a part of his baggage onto the dock, and personally followed by jumping over the side of the vessel as it was pulling away from the dock. He was then and there arrested by the Military Police, taken to the officer in charge of the guard, to whom he gave a signed statement, and was then confined as above stated.

The Steamship Thomas B. Robertson was built and is owned by the United States. Upon her completion about a year ago, she was turned over by her builders to the United States Maritime Commission, by it to the War Shipping Administration, and by it to the Mississippi Shipping Company under a contract, in which it is stated that that company is the agent of the United States, for the operation of the ship, and not an independent contractor, and that her crew are to be paid out of the funds supplied by the United States. The agreement further provides: "The Master shall be an agent and employee of the United States, and shall have and exercise full control, responsibility and authority with respect to the navigation and management of the vessel. * * * The officers and members of the crew shall be subject only to the orders of the master." She is a vessel of a type commonly known as a "liberty ship", and up until August 29, 1943, had been engaged solely in carrying cargo or freight. On that date she was put into shipyard, and a portion of the vessel converted into quarters for the purpose of transporting human beings, specifically, prisoners of war. While lying at dock, as aforesaid, on September 22, 23 and 24th, the vessel was loaded with jeeps, army truck bodies, and other materials for the use of the army and navy in the prosecution of the war. At the time he signed the articles of agreement, McCune did not know any of the facts contained in this paragraph.

Until he was advised by the Chief Steward, on the morning of October 2nd, that troops were coming aboard, McCune did not know that the vessel would carry troops or other humans, except its regular crew, including the gun crew, and thought that his duties were with reference to preparing meals for said crew.

The Army Base was known to petitioner to be such, and he saw members of the Coast Guard on guard aboard the ship, and military policemen in uniform at the entrance into, and at the gangplank, who required all persons on entering or leaving to show passes.

Prior to his signing with the Thomas B. Robertson, he had recently made a voyage in a convoy on a vessel that carried war supplies to Murmansk, Russia, and unloaded them there, and returned to this country.

Petitioner was not informed at the time he signed the articles of agreement, or upon his arrival on the vessel, by the captain of the vessel, or anyone else, that he would be subject to military law.

The sole issue in the case is whether a civilian cook employed under the foregoing circumstances is subject to trial by court-martial of the United States Army for desertion.

A civilian is presumed not to be a person subject to military law, and the party asserting military jurisdiction over him has the burden of proving such jurisdiction, and must point to a valid federal statute which confers it. A court-martial, under the laws of the United States, is a court of special and limited jurisdiction. It has no jurisdiction beyond that given by the statute which confers it, and the civil courts should not, therefore, surrender a civilian to the jurisdiction of the military in doubtful cases, or in cases not clearly covered by the words of the statute. The civil courts may not surrender

a civilian to the jurisdiction of the military for expediency, convenience or even necessity, for to do so would destroy those constitutional rights and privileges guaranteed to citizens of this country.

▋ The constitutional authority for the exercise of military jurisdiction over certain· classes of civilians is contained in the Fifth Amendment to the Constitution, which provides in part, "No person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury, *except in cases arising in the land or naval forces,* or in the Militia, when in actual service in time of War or public danger;" (Emphasis added.) Under the power granted in Section 8, Article 1, of the Constitution, and under the foregoing provisions of the Fifth Amendment, Congress enacted the Articles of War for the government of the army. Act of June 4, 1920, subchapter II, section 1, 41 Stat. 787, 10 U.S.C.A. §§ 1471–1593. The validity of the act is well established. Ex Parte Gerlach, D.C.S.C.N.Y. 1917, 247 F. 616; Ex Parte Reed, 100 U.S. 13, 25 L.Ed. 538; Dynes v. Hoover, 20 How. 65, 15 L.Ed. 838.

Article 2 of the Articles of War, 10 U.S.C.A. § 1473, so far as it is relevant to the issue involved in this proceeding, provides: "The following persons are sub-.ject to these articles and shall be understood as included in the term 'any person subject to military law,' or 'persons subject to military law,' whenever used in these articles: Provided, That nothing contained in this chapter of this title except as specifically provided in article 2, subparagraph (c), shall be construed to apply to any person *under the United States naval jurisdiction unless otherwise* specifically provided by law. * * * (d) All retainers to the camp and *all persons accompanying or serving with the Armies of the United States* without the territorial jurisdiction of the United States, and *in time of war* all such retainers and persons *accompanying or serving with the Armies of the United States in the field,* both within and without the territorial jurisdiction of the United States, though not otherwise subject to these articles;" (Emphasis added.) Subparagraph (c) relates to officers and soldiers of the marine corps when detached for service with the armies of the United States.

The alleged offense was committed "in time of war". The issue, therefore, resolves itself into whether the petitioner was at the time of his quitting the ship a "persons accompanying or serving with the Armies of the United States in the field" within the meaning of the foregoing provisions of Article 2 and Article 2(d) of the Articles of War, 10 U.S.C.A. §§ 1473, 1473(d).

To decide this issue, several questions must be answered.

(1) Was the voyage in this case a military one within the meaning of the term "army in the field"?

▋ This question must be determined from all the facts and circumstances of the case, and in the light of the perils and weapons of the existing war. A military voyage for the purpose of transporting army troops and supplies during the present war is, in my opinion, clearly a military expedition "in the field". Such a voyage is necessary for the maintenance of supplies for the troops in the combat area, and for the transportation of replacements, and is fraught with grave dangers from the land, the sky and the sea.

In the case of Ex Parte Gerlach, supra, Charles E. Gerlach, an employee of the United States Shipping Board, went to Europe as a mate on the Steamship McClellan, a vessel apparently in use as a military ·transport. He was there discharged, and sent back on the El Occidente, an army transport, to New York. He volunteered to stand watch, and for several days did this, but finally refused to continue. For this disobedience to the order of an *army officer,* who was in command of the transport, he was tried by a court-martial and sentenced to five years' imprisonment. In deciding that the court-martial had exclusive jurisdiction, and denying the petition for the writ, the District Judge, said [247 F. 617]: "The words 'in the field' do not refer to land only, but to any place, whether on land or water, apart from permanent cantonments or fortifications, where military operations are being conducted. In this case he was on an army transport, and peril from submarines existed when he refused to stand watch."

▋ At the time McCune quit the ship, the Steamship Thomas B. Robertson, her master and crew, were engaged on a voyage to transport some five hundred troops,

organized under command of their officers, together with their equipment, and other war material, to battle zones. Before sailing, the ship was docked and loaded at an army base which was under strict military control. She had been specially equipped with berths for carrying troops and prisoners of war. This was an organized military enterprise of the army of the highest importance, and, in my opinion, comes clearly within the term "army in the field" under the provisions of Article of War 2(d). Ex Parte Falls, D.C.D.N.J.1918, 251 F. 415; Hines v. Mikell, 4 Cir., 1919, 259 F. 28; Ex Parte Jochen, D.C.S.D.Tex. 1919, 257 F. 200.

(2) Was the petitioner at the time he quit the ship "a person accompanying or serving" with the army?

Petitioner was on board ship for the purpose of cooking and serving meals for the master, and the crew, and gun crew of the vessel, who were engaged in transporting troops, and army and navy supplies to reinforce and supply our military forces across the seas. The troops in an organized body came on board ship the afternoon of October 2nd. Petitioner prepared supper for the troops, and attempted to serve it. These facts identified him as a person "accompanying" the army of the United States, and unless he comes within the exception in Article of War 2, hereinafter discussed, he was at the time he quit the ship, subject to military law under Article of War 2(d).

This Court cannot make the law, but must take it as it finds it, and I find that Congress said, "all persons accompanying or serving with the Armies of the United States", etc. It did not except the master, the officers or the seamen of a merchant ship accompanying or serving with the army in the field, unless they come within the exception in the proviso relating to "naval jurisdiction," in Article 2 of the Articles of War.

But the petitioner's attorney argues that McCune under the contract between the War Shipping Administration and the Mississippi Shipping Company was subject "only to orders of the master" and he could not, therefore, be subject to the Articles of War.

It will be noted that the provision in that contract that the officers and members of the crew "shall be subject only to the orders of the master" comes after the provision in the same paragraph that "the master shall have and exercise full control, responsibility and authority with respect to the navigation and management of the vessel". This, in my opinion, indicates that it was the intention of the parties to the agreement that the officers and members of the crew of the vessel were to be subject only to the orders of the master in respect to the navigation and the management of the vessel. But, regardless of what their intention was, Congress did not make military jurisdiction of civilians, under this Article, dependent upon their agreeing to be subject to the orders of the army. All contracts of civilians in time of war must of necessity be subject to the provisions of Article of War 2(d). Otherwise, the civilian could nullify the provisions of the Article by agreeing with his employer in advance of his "accompanying the army in the field," that he would be subject only to his employer's orders.

In the Gerlach case, supra, the Captain was in charge of the vessel and had the right to call upon all aboard to protect the ship. Gerlach was tried, convicted and sentenced by a court-martial for violation of the orders of an army officer in charge of troops which Gerlach was accompanying aboard the ship.

In the Falls case, supra, articles of agreement providing for the service of Falls were signed by him and Captain J. J. Dawson, Q.M.U.S.R., who was acting for the United States. Petitioner was then assigned to duty as chief cook upon the ship U.S.A.C.T. Edward Luchenback, engaged in transporting supplies for the United States Army. While occupying said position, and just before the ship sailed for a foreign port, Falls attempted to leave the ship with his baggage, and desert the service, and refused to return thereto. As seaman chief cook, Falls was no doubt subject only to the orders of the master of the vessel with respect to the navigation and management of the ship. Nevertheless, the District Court in this case held that Falls was a person accompanying the army in the field.

But petitioner contends, however, that Falls made his contract with the Quartermaster Corps of the Army, and that in the instant case, petitioner's agreement was made with a private shipping company, and the vessel was not a part of the Army Transport Service. The contract of employment, however, does not seem to be de-

cisive of the question, for in the case of In re di Bartolo, D.C.S.D.N.Y.1943, 50 F. Supp. 929, 933, the petitioner was a civilian employee of a private aircraft company, working on military airplanes at an Army Base abroad. In the absence of a contract directly between the petitioner and the army, the District Court in that case found the petitioner to be a person "accompanying" the armies in the field within the meaning of Article of War 2(d), and said, "Such persons must include those who are not employees of the army". It necessarily follows, therefore, that the petitioner was "accompanying or serving with the Armies of the United States in the field" within the meaning of the Articles of War, unless he comes under the exception "naval jurisdiction" discussed in the following question.

(3) Does the petitioner come within the following exception of Article 2 of the Articles of War, "Provided, That nothing contained in this chapter of this title except as specifically provided in article 2, *subparagraph (c)*, shall be construed to apply to *any person under the United States naval jurisdiction* unless otherwise specifically provided by law"?

This is not only a new question, but a most important one. The point was not argued or considered in the Falls case. It was not a relevant issue in the other cases called to my attention. It was mentioned, but the question was decided upon another issue, in the recent case of Hammond v. Squier, D.C.W.D.Wash., S.D., 1943, 51 F. Supp. 227. The question here was not involved in that controversy.

Petitioner urges that he is subject to "naval jurisdiction" within the meaning of the foregoing proviso to Article 2 of the Articles of War, and thus not subject to military jurisdiction. He does not contend, however, nor does the army, that he is subject to the Articles for the government of the navy, but as a merchant seaman subject to be disciplined and punished for desertion, or other offenses, only as provided in 46 U.S.C.A. § 701, providing for punishment for offenses committed by seamen.

He bases his contention on various federal statutes [2] providing for the Bureau of Marine Inspection and Navigation to have general superintendence of the commercial marine and merchant seamen of the United States, so far as civilians and seamen are not, under existing law, subject to the supervision of any other officer of the United States, and upon an Order of the President [3] transferring the Bureau of Marine Inspection and Navigation to the coast guard, which, in time of war, operates as a part of the United States Navy, and is subject to the orders of the Secretary of the Navy.[4] Analyzed, his contention is that by executive order, the President transferred the general superintendence of merchant seamen from one department of government to another, which, in time of war, is a part of the navy, and thereby (1) brought them within the exception, "naval jurisdiction", and by so doing excluded them from the provisions of the 2nd Article of War, and (2) that such action did not make them amenable to the Articles for the government of the navy. With the second part of this contention, I agree, with the first part, I cannot agree.

The Articles of War, of which the proviso to Article 2 is a part, form a criminal code for the government of the armies of the United States. They have nothing to do with administrative matters apart from criminal administration for the army. The word "jurisdiction" is employed in the proviso in the sense of criminal or court-martial jurisdiction, not general administrative jurisdiction.

The 2nd Article of War, of which the proviso in question is a part, defines those who are "subject to military law," i.e., those who are subject to the disciplinary jurisdiction of the Articles of War as administered by the army and to trial by army court-martial. When that Article refers to and excludes from that disciplinary jurisdiction those who are subject to *naval jurisdiction,* it is referring to and excluding those subject to naval criminal or disciplinary jurisdiction, to those subject to that jurisdiction, that power, that authority, conferred by the Articles for the government of the navy. The purpose of the proviso was to prevent officers or men of the navy, and members of the marine corps or coast guard when operating as a part of the navy, from being subject to the Articles of War and to army criminal jurisdiction and to leave them exclusive-

---

[2] 5 U.S.C.A. § 597a; 5 U.S.C.A. § 597; 46 U.S.C.A. § 2.

[3] Executive Order of date February 28, 1942, effective March 1, 1942, No. 9083, 50 U.S.C.A.Appendix § 601 note.

[4] 14 U.S.C.A. § 1.

ly subject to naval criminal jurisdiction under the Articles for the government of the navy. This conclusion can be drawn from the provisions of subparagraph (c) of the 2nd Article of War which subjects members of the marine corps, normally under naval "court-martial" jurisdiction, to army "court-martial" jurisdiction when detached for service with the armies of the United States.

That the word "jurisdiction" as employed in the proviso to Article of War 2 must be taken in the sense of the Articles as a whole, that is, as referring to court-martial jurisdiction, necessarily follows from the irreconcilable inconsistencies to which a different construction might lead. For instance, it is common knowledge that during the present war different combat zones are each under the general direction of a single commander, military or naval. Both army and navy forces may be operating in an area under the common direction and control of an army officer or of a navy officer. Certainly it cannot be argued that members of the armies of the United States who might be operating under such supervisory control of a naval officer are not for such time subject to the disciplinary jurisdiction of the Articles of War. Or take another example: When our troops leave a harbor of the United States and go under naval convoy to foreign battle fronts, they are at some points while in the harbor and in the convoy under certain regulatory direction of the navy or the coast guard. Yet it would be erroneous to assume that at those times they are lifted out of the disciplinary jurisdiction of the Articles of War by virtue of the proviso to the 2nd Article of War.

■ It must be concluded, therefore, that the proviso to Article 2 is merely intended to preclude the operation simultaneously of army and navy court-martial jurisdiction and that the only persons excepted by the proviso are those who are subject to the Articles for the government of the navy.

■ While petitioner does not contend that he is subject to the Articles for the government of the navy, it is necessary for me to decide that question in order to determine if he comes within the meaning of the exception "naval jurisdiction" in the proviso. The criminal code for the government of naval forces, like the Articles of War, the criminal code for the government of the armies, are statutory and no one is subject to discipline under these articles except as provided by statute. McClaughry v. Deming, 1902, 186 U.S. 49, 69, 22 S.Ct. 786, 46 L.Ed. 1049.

The Bureau of Marine Inspection and Navigation is established by the provisions of the United States Code.[5] The functions of that Bureau among others, include the general supervision and licensing of all members of the Merchant Marine, as well as the revocation of such licenses.[6] These functions are purely administrative and neither the Secretary of Commerce, nor the Bureau of Marine Inspection and Navigation is given any criminal jurisdiction thereunder over merchant seamen.

By Executive Order No. 9083 of March 1, 1942, the functions of the Bureau of Marine Inspection and Navigation, including the foregoing functions, were transferred to the Commandant of the United States Coast Guard.[7] A careful reading of

---

[5] 46 U.S.C.A. §§ 1 and 2, provide:

§ 1. Bureau of Marine Inspection and Navigation; establishment

"There shall be in the Department of Commerce of the United States a Bureau of Marine Inspection and Navigation to be under the direction of a chief of bureau who shall be appointed by the Secretary of Commerce."

"§ 2. General duties of Director of Bureau

"The Director of the Bureau of Marine Inspection and Navigation, under the direction of the Secretary of Commerce, shall have general superintendence of the commercial marine and merchant seamen of the United States, so far as vessels and seamen are not, under existing laws, subject to the supervision of any other officer of the Government. He shall be specially charged with the decision of all questions relating to the issue of registers, enrollments, and licenses of vessels, and to the filing and preserving of those documents; and wherever in this title any of the above-named documents are required to be surrendered they shall be surrendered and returned to the Director of the Bureau of Marine Inspection and Navigation."

[6] Title 46, § 2, U.S.C.A. fn. 5, supra.

[7] 7 Fed.Reg. 1609, 50 U.S.C.A.Appendix § 601 note. Section 3 of that order reads as follows:

"Section 3. Functions Transferred to U. S. Coast Guard

"Those functions of the Bureau, Offices and Boards specified in Section 1 (which include the Bureau of Marine Inspection and Navigation), and of the

the executive order shows that it does not enlarge the functions transferred, or create new ones, nor for that matter was the President authorized to do so by virtue of the First War Powers Act, 50 U.S.C.A. Appendix § 601, pursuant to which the executive order was issued. The executive order does not purport to, nor could it put merchant seamen into the coast guard or the navy or to subject them to trial by navy court-martial. All that the order purports to do is to transfer to the coast guard certain administrative and regulatory functions of the Bureau of Marine Inspection and Navigation with respect to merchant seamen.

It is clear, then, that the controls over the petitioner originally in the hands of the Bureau of Marine Inspection and Navigation under the Department of Commerce, and later transferred by executive order to the coast guard would not make the petitioner a person subject to naval criminal jurisdiction, even though the coast guard in time of war operates as a part of the navy and under the orders of the Secretary of the Navy.

It is equally clear that the basic statutes providing for the organization of the coast guard did not subject the petitioner to naval criminal jurisdiction. The personnel of the coast guard is provided for by Section 5, Title 14, United States Code Annotated. Petitioner is not a member of the coast guard within the coverage of that section. Section 1 of Title 14, United States Code Annotated, provides that the coast guard shall operate as part of the navy in time of war or when the President shall so di-

rect, and Section 3 of Title 14, United States Code Annotated, provides in part that, whenever, in time of war, the coast guard operates as part of the navy, in accordance with law, the personnel of that service shall be subject to the laws prescribed for the government of the navy. "The laws prescribed for the government of the Navy" are of course the Articles for the government of the navy, 34 U.S.C. A. §§ 1200, 1201, the criminal code for 'he government of naval personnel. The words "personnel of that service" can only refer to members of the coast guard made such by provisions of Section 5, Title 4, United States Code Annotated, previously mentioned. Merchant seamen as such are not members of the coast guard and are not therefore, by virtue of the foregoing provisions, subject in time of war to naval criminal jurisdiction as are members of the coast guard itself.

At the time of the enactment of the Articles of War there was no statute giving the navy jurisdiction comparable to that given the army under Article of War 2(d) making civilians accompanying or serving such forces subject to military law. Such civilians, including merchant seamen, were therefore at the time of the adoption of the Articles of War, not subject to trial by navy court-martial under any circumstances. Recently, by an Act of March 22, 1943, 34 U.S.C.A. § 1201, Congress extended the jurisdiction of naval court-martial in time of war or national emergency to certain persons accompanying or serving with the navy *outside the continental limits* of the United States.[8] Among

Secretary of Commerce, pertaining to * * * licensing and certificating of officers, pilots, and seamen; suspension and revocation of licenses and certificates; investigation of marine casualties; enforcement of manning requirements, citizenship requirements, and requirements for the mustering and drilling of crews; control of log books, shipment, discharge, protection, and welfare of merchant seamen; * * * are transferred to the Commandant of the United States Coast Guard, to be exercised by him under the direction and supervision of the Secretary of the Navy."

8 Pub.L. 12, 78th Cong., 1st sess., 34 U.S.C.A. § 1201. The Act provides: "That in addition to the persons now subject to the Articles of the Government of the Navy, all persons, other than persons in the military service of the United States, outside the conti-

nental limits of the United States accompanying or serving with the United States Navy, the Marine Corps, or the Coast Guard when serving as a part of the Navy, including but not limited to persons employed by the Government directly, or by contractors or subcontractors engaged in naval projects, and all persons, other than persons in the military service of the United States, within an area leased by the United States which is without the territorial jurisdiction thereof and which is under the control of the Secretary of the Navy, shall, in time of war or national emergency, be subject to the Articles for the Government of the Navy except insofar as these articles define offenses of such a nature that they can be committed only by naval personnel: Provided. That the jurisdiction herein conferred shall not extend to Alaska, the Canal

other reasons, the foregoing statute would not be applicable to the petitioner because at the time of the offense in question, he and the merchant ship to which he was attached were not outside the continental limits of the United States. The ship the petitioner quit was in the process of leaving its moorings at Norfolk, Virginia, which is within the continental limits of the United States.

There is no law of the United States under which the petitioner at the time of his alleged offense was subject to naval court-martial jurisdiction.

(4) Did the petitioner at the time have the right to quit?

Petitioner urges that his quitting the ship was not desertion, and says that if he was serving with the armies in the field, then so were the other members of the crew of this vessel, and that several of the crew who had signed on, did resign or quit, their releases being attached to the articles of agreement. The question of whether the petitioner, with the consent of the master of the vessel, might have quit, is not before me, but, in my opinion, with the consent of the master, he could have quit, without being guilty of desertion under the Articles of War. The petitioner having not yet been tried, the sole question before me is, has a court-martial of the United States Army jurisdiction of his person, and of the offense charged against him? Collins v. McDonald, 258 U.S. 416, 42 S.Ct. 326, 66 L.Ed. 692. A court-martial of the army has jurisdiction of the offense of desertion. Article of War 58, 10 U.S.C.A. § 1530; Article of War 28, 10 U.S.C.A. § 1499. Whether he is guilty of the charge of desertion is a matter for a military tribunal, if its jurisdiction is upheld, to decide, upon such testimony as may be presented at the trial.[9]

(5) Finally, petitioner says that he did not know that he was subject to military law, and did not understand that he was accompanying the army in the field. He knew on the morning of October 2nd, that troops were coming aboard. He did not resign or quit until the afternoon, after he had prepared and attempted to serve meals to the troops. However, in my opinion, there is nothing in Article 2(d) of the Articles of War or in the constitutional provisions from which that Article derives its authority, requiring that a civilian to whom military law applies under that Article, must know in advance, or be given to understand, that military law is thus applicable, nor is there anything in that Article, or its constitutional source, requiring that the individual thus subjected understand that he is accompanying or serving with the army in the field, within the meaning of those terms. The test is solely an objective one, and the only inquiry is whether in fact from all the circumstances of the particular case, the person is accompanying or serving with the army in the field. Since the authorities trying to uphold military jurisdiction have the burden of establishing such jurisdiction, the provisions of Article 2(d) of the Articles of War would be ineffective, if those authorities were required to prove the knowledge of the persons subjected to military law under that Article, that military law was applicable and that they were accompanying or serving with the army in the field. The history of the application of military law to civilians does not disclose an instance or a case in which there were indications that it was necessary to establish such knowledge in order to prove military jurisdiction over civilians. Congress did not say all persons knowingly accompanying or serving the army in the field.

For the foregoing reasons, the application for the writ of habeas corpus will be denied, and counsel may submit appropriate order accordingly.

This opinion will stand as the findings of fact, and conclusions of law in this pro-

Zone, the Hawaiian Islands, Puerto Rico, or the Virgin Islands, except the islands of Palmyra, Midway, Johnston, and that part of the Aleutian Islands west of longitude one hundred and seventy-two degrees west."

[9] I do not believe, however, from the facts before me, that McCune left the ship with the intent to avoid hazardous duty, or to shirk important service. He had "pitched in" in the emergency, and prepared meals for five hundred additional troops with little help. When the Major told him in effect, he could not serve the officers, he could not serve the soldiers, he could not clear the top side to complete the preparation of the meals for the crew, until the Colonel was ready to eat, he felt he was unfairly treated, lost his temper, and in a fit of passion, jumped over the side as the ship was pulling away.

ceeding under Rule 52(a) of Rules of Civil Procedure, 28 U.S.C.A. following section 723c. Society of European S.A.A.C. v. New York Hotel Statler Co., D.C., 19 F. Supp. 1. And an order so providing must be included in the final order denying the petition.