**UNITED STATES**

**v.**

**Senior Airman Darrel W. ANDERSON, FR 214–66–1812 United States Air Force.**

**ACM S24849.**

U. S. Air Force Court of Military Review.

Sentence Adjudged 6 Sept. 1979.

Decided 17 March 1981.

Appellate Counsel for the Accused: Colonel Larry G. Stephens and Major Robert G. Gibson, Jr. Captain Jerome S. Gabig, Jr., on the brief.

Appellate Counsel for the United States: Colonel James P. Porter, Major Robert T. Mounts and Captain N. Steven Linder.

Before POWELL, MILES and MAHONEY, Appellate Military Judges.

**DECISION**

MILES, Judge:

We hold that one of the enlisted members of accused's court-martial panel was a member of accused's unit for purposes of

Article 25(c), Uniform Code of Military Justice, 10 U.S.C. § 825(c). As a result, the court-martial panel which tried the accused was jurisdictionally defective.

Contrary to his pleas, the accused was convicted by a special court-martial, which included officers and enlisted members, of attempted transfer of mescaline and transfer of cocaine and marijuana in violation of Articles 80 and 134, 10 U.S.C. §§ 880, 934, Code, *supra.*

At the time of trial, the accused was assigned to the 341st Security Police Squadron, one of several squadrons included in the 341st Security Police Group. One of the court members, Chief Master Sergeant Larry E. Larios, was listed on the orders appointing the court as assigned to the 341st Security Police Group. At no time during the trial did the military judge advise the court members that enlisted members of the court could not be a member of the same unit as the accused.[1] No challenge was made to Sergeant Larios' presence on the court-martial panel. Chief Master Sergeant Larios had been assigned to the 341st Security Police Squadron for a number of years, but at the time of trial he was nominally assigned to the 341st Security Police Group staff. Chief Master Sergeant Larios had daily contact with the security police squadron commander and worked closely with other squadron personnel.

Captain Euler, the commander of the 341st Security Police Squadron and the accuser in the case, testified as a prosecution witness. His testimony included the following:

Q. How many individuals do you have in your squadron?

A. Counting the Group Headquarters, I believe we're close to about 280 individuals. I have SPS and Security Police Group under me for administrative purposes.

Q. And you're the Commander of those individuals.

A. Yes, I am.

During our consideration of this case, appellate government counsel agreed that enlisted personnel of the 341st Security Police Group staff such as Chief Master Sergeant Larios were attached to the 341st Security Police Squadron for administrative and disciplinary purposes including the imposition of Article 15 punishments and the exercise of court-martial jurisdiction.[2] In fact, there was *no* separate squadron for personnel of the security police group staff.

The precise issue involved here is whether, under such circumstances, enlisted personnel assigned or attached to a squadron for administrative and disciplinary purposes including the imposition of Article 15 punishments and court-martial purposes are members of that same squadron for purposes of Article 25(c), Code, *supra.* If they are, they are not eligible to serve on a court-martial involving a member of that squadron. Article 25(c) of the Uniform Code of Military Justice, *inter alia,* provides:

(1) Any enlisted member of an armed force on active duty who is not a member of the same unit as the accused is eligible to serve on general and special courts-martial....

(2) In this article, the word "unit" means any regularly organized body as defined by the Secretary concerned, but in no case may it be a body larger than a company, squadron, ship's crew, or body corresponding to one of them.

The Manual for Courts-Martial, 1969 (Rev.), paragraph 4b, *inter alia,* provides: "*Air Force.* A 'unit' of the Air Force in the

---

1. Air Force Pamphlet 111–6, Procedure Guide for Courts-Martial, 19 April 1976, at page 17, provides for the military judge to inquire as to whether any enlisted members of the court are a member of the same unit as the accused. Also see Manual for Courts-Martial, 1969 (Rev.), Appendix 8b, at A8–12.

2. By the term "court-martial jurisdiction" we are not suggesting that squadron commanders normally convene any courts-martial. However, squadron commanders do, as accusers, normally initiate court-martial charges. *See* para. 29, Manual for Courts-Martial, *supra.*

sense of Article 25(c) is a squadron or other organization of the Air Force for which a separate unit military strength balance report is prepared."

▮ The limitation against enlisted personnel of an accused's unit serving on his court-martial is jurisdictional in our view.[3] Appellate government counsel do not dispute the jurisdictional effect of the limitation but argue that Air Force regulations define unit, for military strength balance reporting purposes, as organizations having separate Personnel Accounting Symbol (PAS) codes.[4] They assert that since the security police group and the security police squadron have separate PAS codes, Chief Master Sergeant Larios was simply not a member of the same unit as the accused.

▮ However, in our view, an individual attached to a squadron for administrative, disciplinary and court-martial purposes and thus a member of the unit, subject to its discipline, for other purposes under the Code, is equally a member for purposes of Article 25(c). The prohibition against enlisted personnel from the same unit avoids "bias or prejudice either for or against an accused which experience has shown was likely to develop in an integrated body of troops where the members worked and lived in close association with each other."[5] It avoids "a possible mental identification with the supposed interests of his unit in the disposition of the case."[6] The limitation also has a salutary effect in insulating enlisted members from possible criticism from other members of the same unit and

in avoiding command influence proscribed by Article 37, Code, 10 U.S.C. § 837, supra.

▮ Considering the object and purpose of the codal limitation on eligibility, we hold that Chief Master Sergeant Larios was a member of the 341st Security Police Squadron for purposes of Article 25(c), Code, supra, because he was a member of that same squadron for other administrative and disciplinary purposes under the Code, supra. To hold otherwise would provide a potential device to subvert both the reasons and the salutary benefits of the limits on eligibility. Moreover, no cogent reason exists, in our view, as to why Air Force enlisted members otherwise attached to and therefore considered members of an accused's squadron need to be available for appointment as court members.[7] We believe our position is consistent with the language and purpose of the Uniform Code.

In view of our disposition of this case, it is unnecessary to decide the other assertions of error urged by appellate defense counsel. The findings of guilty and the sentence are set aside. A rehearing is ordered.

POWELL, Senior Judge, concurs.

MAHONEY, Judge (dissenting): ·

The issue in this case is the definition of the term "unit" for purposes of determining enlisted member eligibility for service upon courts-martial. In Article 25 of the Uniform Code of Military Justice, Congress partially defined the term by listing the maximum size of a "unit." The Code dele-

---

3. United States v. Timmons, 49 C.M.R. 94 (NCMR 1974); United States v. Perry, 20 C.M.R. 562 (CGBR 1955); United States v. Cook, 16 C.M.R. 404 (NBR 1954). Cf. McClaughry v. Deming, 186 U.S. 49, 22 S.Ct. 786, 46 L.Ed. 1049 (1902); United States v. Singleton, 21 U.S.C.M.A. 432, 45 C.M.R. 206 (1972); United States v. White, 21 U.S.C.M.A. 583, 45 C.M.R. 357 (1972). Contra. United States v. Scott, 25 C.M.R. 636 (A.B.R.1958). Senate Report No. 486, 81st Congress, 1st session, at 14, reprinted Government Printing Office, Index and Legislative History, Uniform Code of Military Justice (1950) states: "Subdivision (c) limits the competency of enlisted personnel to cases where they are not members of the same

unit as the accused." Later, the term "eligible" was substituted during floor debate.

4. Air Force Regulation 35–40, Military Personnel Strength Accounting Methods, paragraph 1–3, 11 February 1974, Change 8 (5 April 1977).

5. United States v. Timmons, supra note 3, at 95.

6. United States v. Scott, supra note 3, at 640.

7. The inquiry already required, supra, note 1, should be modified to insure prospective enlisted court members are not attached to the same squadron as the accused for administrative and disciplinary purposes.

gates to the Secretaries of the respective services the authority to complete the definition. With guidance from the President, paragraph 4*b*, Manual for Courts-Martial 1969 (Rev.), the Secretary of the Air Force has completed the definition of the term "unit" for the Air Force. I find that definition wholly adequate to resolve this case. In my view, the majority's expansion of that definition is an unnecessary and unwarranted infringement upon the prerogatives of Congress, the President, and the Secretary of the Air Force.

For purposes of clarity, I have divided my dissenting opinion into four sections. The *first* section states *my* position: in accord with Article 25 and relevant implementing directives, the enlisted member in question was eligible to serve as a member of the accused's court-martial. The next two sections are in response to the position of the majority. Specifically, in the *second* section, I indicate why I believe, as a matter of judicial restraint, the majority's reliance upon legislative history is inappropriate in this case. In the *third* section, I present the results of my research of the legislative history, which lead me to a different conclusion as to statutory intent than that reached by the majority: I am persuaded that the purpose of the several limits regarding eligibility of enlisted court members was to avoid compelling the convening authority to appoint enlisted members of the accused's unit to serve on courts-martial in remote locations or combat conditions where no other enlisted personnel are available. Finally, in the *fourth* section, I conclude by pointing out what I perceive to be the untoward consequences of today's decision.

## I. ARTICLE 25 IS CLEAR AND UNAMBIGUOUS: CHIEF LARIOS WAS ELIGIBLE TO SERVE AS A MEMBER OF THE ACCUSED'S COURT–MARTIAL.

The question of who may serve on courts-martial was raised and resolved by Congress in enacting Article 25 of the Uniform Code of Military Justice, 10 U.S.C. § 825. In view of the complexity of the limitations on enlisted member eligibility, I quote the section in its entirety:

§ 825. Art. 25. Who may serve on courts-martial

(a) Any commissioned officer on active duty is eligible to serve on all courts-martial for the trial of any person who may lawfully be brought before such courts for trial.

(b) Any warrant officer on active duty is eligible to serve on general and special courts-martial for the trial of any person, other than a commissioned officer, who may lawfully be brought before such courts for trial.

(c) (1) *Any enlisted member of an armed force on active duty who is not a member of the same unit as the accused is eligible to serve on general and special courts-martial for the trial of any enlisted member of an armed force who may lawfully be brought before such courts for trial, but he shall serve as a member of a court only if*, before the conclusion of a session called by the military judge under section 839(a) of this title (article 39(a)) prior to trial or, in the absence of such a session, before the court is assembled for the trial of the accused, *the accused personally has requested in writing that enlisted members serve on it. After such a request, the accused may not be tried by a general or special court-martial the membership of which does not include enlisted members in a number comprising at least one-third of the total membership of the court, unless eligible enlisted members cannot be obtained on account of physical conditions or military exigencies. If such members cannot be obtained, the court may be assembled and the trial held without them, but the convening authority shall make a detailed written statement, to be appended to the record, stating why they could not be obtained.*

(2) *In this article, the word "unit" means any regularly organized body as defined by the Secretary concerned, but in no case may it be a body larger than a company, squadron, ship's crew, or body corresponding to one of them.*

(d) (1) When it can be avoided, no member of an armed force may be tried by a court-martial any member of which is junior to him in rank or grade.

(2) When convening a court-martial, the convening authority shall detail as members thereof such members of the armed forces as, in his opinion, are best qualified for the duty by reason of age, education, training, experience, length of service, and judicial temperament. No member of an armed force is eligible to serve as a member of a general or special court-martial when he is the accuser or a witness for the prosecution or has acted as investigating officer or as counsel in the same case. [Emphasis added.]

Applying the statutory provisions to the facts in this case, most of the requisites for Chief Larios' eligibility as a court member are easily satisfied:

    a.   the accused was enlisted;

    b.   the accused's personal written request for enlisted members was timely, and is attached to the convening orders in the record of trial;

    c.   Chief Larios was not junior in grade or rank to the accused; and

    d.   the record establishes that Chief Larios was not the accuser, a witness for the prosecution, an investigating officer, or counsel in the case.

The remaining statutory question is whether Chief Larios was a member of the same "unit" as the accused. If he was, I would concur with the majority: the error was jurisdictional, and the trial a nullity.[1]

In determining whether Chief Larios was a member of the same "unit" as the accused, and thereby rendered ineligible as a court member, I look to the legislative definition of "unit" provided in Article 25(c)(2):

    *—any regularly organized body*;

    *—as defined by the Secretary concerned*;

*—in no case ... larger than a ... squadron.*

Thus, a "unit" is a regularly organized body, of squadron size or smaller, as further defined by the Secretary of the Air Force. In formulating such definition the Secretary has been provided guidance by the President:

A "unit" of the Air Force in the sense of Article 25(c) is a squadron or other organization of the Air Force for which a separate unit military strength balance report is prepared.

Paragraph 4*b*, Manual for Courts-Martial, 1969 (Rev.). The definition of "unit" provided by the Secretary of the Air Force is promulgated in Air Force Regulation 35–40, Military Personnel Strength Accounting, 11 February 1974, relevant portions of which are quoted below:

      *       *       *       *       *       *

### MILITARY PERSONNEL STRENGTH ACCOUNTING–GENERAL

1 1.   Responsibility.  The Deputy Chief of Staff, Personnel, HQ USAF, is responsible for active duty military personnel strength accounting in the Air Force.

1-2.   Objective.  Air Force active duty military personnel strength accounting methods are designed to furnish accurate and timely strength data to military commanders, planners, and managers. Strength accounting is an integral part of the Personnel Data System (PDS) which makes optimum use of electronic data processing equipment and techniques.

1-3.   Explanation of Terms.  For purposes of this regulation the following explanations apply.

      *       *       *       *       *       *

    d.   Activity.  Any organization or element thereof which has not been assigned

---

[1] If, as the majority has determined, Chief Larios was a member of the same "unit" as the accused, and that "unit" was of squadron size or smaller, then the Chief was *ineligible* to serve as a court member. Not all of the criteria set forth in Article 25, and summarized in the text, render a member ineligible. The appointment of members junior in grade to the accused, for example, is within the discretion of the convening authority, *United States v. Branford*, 2 C.M.R. 489 (ABR 1952), and failure to challenge for cause, or object at trial, constitutes a waiver of any error in the exercise of that discretion. *United States v. Aho*, 8 M.J. 236 (C.M.A.1980).

an exclusive personnel accounting symbol in the Personnel Accounting Symbol (PAS) Directory.

e. Assigned. The state of belonging to a unit and being counted as part of that unit's assigned strength.

\* \* \* \* \* \*

q. *Unit. Any organization listed in the PAS Directory, including detachments and operating locations, to which an exclusive PAS has been assigned.*

1–4. Policy. The official [active duty] military personnel strength is derived from the personnel data accumulated and maintained in the PDS. This strength is derived from computer counts of active computerized personnel records maintained by HQ AFMPC/DPMD. The totals of these counts are the official [active duty] military personnel strength of the Air Force.

1–5. Basic Principles:

a. *Each USAF member is assigned to a specific active unit while on active duty. A member will not be assigned to more than one unit at the same time.*

b. *A member is counted as part of the strength of the unit to which he or she is assigned. His or her duty status, location, or attachment to another unit does not change his or her assigned status.*

c. For strength accounting purposes, a member is assigned to a unit (not to an activity or installation). If a detachment or subordinate element is not identified by an exclusive PAS, it is not a unit for military personnel strength accounting purposes. This principle applies regardless of the detachment's physical location and the member's duty location.

\* \* \* \* \* \*

BY ORDER OF THE SECRETARY OF THE AIR FORCE [Emphasis added.]

Turning to the facts in the record before us, there is no doubt that the accused was assigned to the 341 Security Police Squadron, and that Chief Larios was assigned to the 341 Security Police Group.[2] While this issue was not litigated at the trial, records filed before us on this appeal clearly establish a separate PAS code for each of those organizations.[3] Thus, as defined by Con-

2. The majority opinion states that Chief Larios was "nominally" assigned to the 341 Security Police Group. To the extent this qualification implies some lack of substance to the Chief's assignment, I disagree. In the course of our review we have accepted for consideration an authenticated official record showing that Chief Larios was assigned to the Group at the time of the accused's trial. He was assigned to no other unit at that time, and his unit of assignment was not altered by his attachment to the Squadron for administrative and disciplinary purposes. Paragraph 1–5a and 1–5b, Air Force Regulation 35–40, Military Personnel Strength Accounting, 11 February 1974. For *strength accounting purposes*, paragraph 4*b*, Manual for Courts-Martial, 1969 (Rev.), Chief Larios was assigned to the 341 Security Police Group.

3. The Personnel Accounting Symbol (PAS) Directory lists, at page 116, PAS MBOSFDHF for the 341st Security Police Squadron, which was the accused's unit. On the same page, the directory lists separate PAS codes for two other squadrons within the 341st Security Police Group, and lists the PAS for the Group as MBOSFXWZ. Clearly, the Secretary of the Air Force has defined the 341st Security Police Group, and each of its three squadrons, as separate "units."

The Navy Court of Military Review recently addressed essentially the same issue presented here. The accused was a member of the ship's company. The enlisted members of his court-martial were members of the embarked squadrons, which maintained separate unit personnel diaries. Paragraph 4*b*, Manual for Courts-Martial, 1969 (Rev.). The Court held that those embarked squadrons retained their status as separate "units" for purposes of Article 25(c), Uniform Code of Military Justice,

... notwithstanding their deployment on board RANGER and notwithstanding the authority of the ship's commanding officer to exercise special or summary court-martial jurisdiction over the members of the embarked squadrons, and to impose non-judicial punishment on the members of those units. As with any large military base with many tenant commands, each with its own separate diary, or as with any battalion with its several companies, there is bound to be some professional as well as social interaction among the individual members; but those commands and those companies remain "units" within the definitions set out by the UCMJ and the *Manual* as long as they retain their own unit personnel diary separate from the greater command. [citations and footnote omitted].

gress, and the Secretary of the Air Force pursuant to statutory delegation, the accused and Chief Larios were assigned to separate and distinct "units" within the clear meaning of Article 25(c)(1), Uniform Code of Military Justice.[4] Therefore, Chief Larios was "eligible" to serve as an enlisted member of the court-martial which tried the accused.[5]

Believing, as I do, that the Code speaks for itself, I am hesitant to proceed further, lest I obscure my position. However, since the majority opinion relies in part upon legislative history, I wish to point out why I believe such reliance is at variance with accepted principles of statutory construction.

## II. COURTS MUST APPLY CLEAR AND UNAMBIGUOUS STATUTES AS ENACTED BY THE LEGISLATIVE BODY.

As an aid in determining the intent, and hence the applicability, of legislative enactments, courts have developed numerous conceptual devices, the goal of which is to determine the intent of the legislature at the time it enacted the statute. These devices are not substantive rules of interpretation, but procedural guides aimed at a common end: the determination of the actual intent of the legislature.[6] *Paramount among these procedural guides is the principle that an unambiguous statute is the clearest expression of legislative intent.*[7]

Such statutes must be applied as enacted, without resort to other aids in determining intent, such as legislative history.[8]

In applying any statute, such as Article 25, it is our judicial function to apply the separate parts in a literal fashion, harmonious with the rest of the statutory scheme.[9] Only where such efforts fail are we at liberty to look outside the "four corners" of the statute in an effort to construe its meaning and effect. In my opinion, the majority's expanded definition of the word "unit" is unnecessary for interpretation or application of the Code to the facts of this case, and it constitutes an unwarranted usurpation of the legislative function.[10]

The term "unit", with reference to a military organization, has no generally fixed or accepted meaning among the services. Were it undefined in the statute, I would be somewhat more hesitant to disagree with the conclusion reached by the majority. However, the Congress, in enacting Article 25, provided for a complete definition of the term "unit", for purposes of that statute, in clear, easily discernible terms.[11] In determining the scope and applicability of that statute, we are required to accept and apply that definition.[12]

In arriving at its conclusion, the majority places heavy, if not exclusive, emphasis on the fact that the 341 Security Police Squadron Commander exercised administrative

*United States v. Brown*, 10 M.J. 589, 590 (N.C. M.R.1980).

4. Even were I to conclude that the accused and Chief Larios were members of the same "unit", I would not find that fact to be disqualifying in the circumstances presented. The "unit" described by the majority consists of the 341st Security Police Squadron, *plus* all enlisted personnel of the 341st Security Police Group. Perforce, a squadron plus a separate component of enlisted personnel—whatever one chooses to call such a "unit"—is *larger* than a squadron. Hence, Chief Larios' co-membership with the accused in such a "unit" would not render him ineligible as a court member. Article 25(c)(2), Uniform Code of Military Justice.

5. The question presented here is not whether the convening authority would have been better advised to appoint the enlisted members from outside the Security Police Group, or whether, once appointed, Chief Larios should

have served as a member. The fact is that his appointment was within the discretion of the convening authority, and that he was not challenged, nor were any facts elicited on voir dire which would have formed the basis of a challenge for cause.

6. 73 Am.Jur.2d, Statutes, §§ 145, 146, 204.

7. 73 Am.Jur.2d, Statutes, §§ 147, 194.

8. 73 Am.Jur.2d, Statutes, §§ 151, 170.

9. 73 Am.Jur.2d, Statutes, § 254.

10. 73 Am.Jur.2d, Statutes, § 197.

11. Article 25(d)(2), Uniform Code of. Military Justice.

12. 73 Am.Jur.2d, Statutes, §§ 224, 225.

and non-judicial punishment authority over enlisted members of the 341 Security Police Group.[13] It is this commonality of disciplinary and administrative authority over the accused and Chief Larios that the majority finds pivotal in its determination to expand the statutory definition of the term "unit."

My reading of Article 25 discloses no reference to commonality of disciplinary and administrative authority in *any* fashion, much less in relation to the legislative definition of the term "unit." In limiting the eligibility of enlisted members for service on courts-martial, circumstances, such as those presented in this case, were *not* unforeseeable to the drafters of the Code. Even if they were, proper exercise of judicial restraint on our part precludes us from altering the clear statutory scheme to accommodate circumstances which could have been dealt with by the legislature.[14]

In view of the foregoing, I believe it is inappropriate to refer to the legislative history of Article 25 to determine the eligibility of Chief Larios to serve as a member of the accused's court-martial. However, since the majority has quoted some references to legislative history in support of its position, I have undertaken my own examination of the relevant legislative history.

III. LEGISLATIVE HISTORY CONFIRMS THAT CONGRESS DID NOT INTEND A BROADENING OF THE CODAL DEFINITION OF "UNIT" IN DETERMINING ENLISTED MEMBER ELIGIBILITY.

I have examined the legislative proposals, hearings, debates, and reports relevant to Article 25 as presently enacted.[15] My examination reveals that, while there are "salutary benefits of the limits on eligibility" of enlisted members, they are ancillary to the intent of the statutory scheme.

I have found no single statement or report which reconciles all of the facets of the codal provisions pertaining to enlisted membership on courts-martial. To the extent there is a unified rationale for the entire scheme, it must be gleaned piecemeal from the available history.[16]

---

**13.** Captain Euler was the commander of one of three squadrons within the 341 Security Police Group. To the extent that he exercised administrative and disciplinary supervision over enlisted members of the 341 Security Police Group, he did so by delegation of authority from the 341 Security Police Group commander who could, at any time, withdraw such delegated authority altogether, or in specific cases. In view of Chief Larios' high grade (E–9), I find it inconceivable that Captain Euler would take disciplinary or adverse administrative action against him without the knowledge and approval of the Group Commander.

Captain Euler had no authority to exercise court-martial jurisdiction. Articles 22, 23, 24, Uniform Code of Military Justice, 10 U.S.C. §§ 822, 823, 824; paragraphs 2–1 and 2–3, Air Force Manual 111–1, Military Justice Guide, 2 July 1973. Moreover, the majority's reference to his role as a potential accuser fails to distinguish him from every other person subject to the Code, who also may act as an accuser. Article 30, Uniform Code of Military Justice, 10 U.S.C. § 830.

**14.** 73 Am.Jur.2d, Statutes, §§ 149, 225.

**15.** Generally, the legislative history includes the history of predecessor statutes, the historical context of the statute, and the history of its enactment, including proposals made and abandoned, testimony at committees, committee reports and commentary, and floor debates. *See,* 73 Am.Jur.2d, Statutes, §§ 150, 170–79.

**16.** As a starting point, I quote the commentary which accompanied Article 25, as read at the House Hearings, and the immediately following dialog between Representative Rivers and a staff member, Mr. Smart:

Commentary: Subdivisions (a), (b), and (c) make officers, warrant officers, and enlisted persons competent to sit on the courts martial of any armed force, without regard to whether they are members of the same armed force as the convening authority, or of the same armed force as the accused.

\*  \*  \*  \*  \*  \*

Subdivision (c) limits the competency of enlisted persons to cases where they are not members of the same unit as the accused. By section 212 of Public Law 759, Eightieth Congress, second session (1948) (see A.W. 16) Congress similarly limited competency to enlisted persons not assigned to the same company or corresponding military unit. A corresponding military unit aboard a ship is felt to be the ship's crew, which, though it may in some cases be a larger group than the Army company, is the same kind of integrated body, living and working in close association.

The last sentence of the first paragraph of subdivision (c) was added to make it possible

The impetus, and unifying objective of the predecessor provisions dealing with enlisted membership on courts-martial, was to proceed with a trial where competent enlisted persons cannot be obtained. This is to avoid long delays in the administration of justice and the expensive process, which might otherwise be necessary of transporting witnesses or court members great distances. Such delays and expenses would arise in connection with offenses committed on ships at sea or in isolated units ashore, such as remote weather stations. The language of the subdivision makes it clear that mere inconvenience is not ground for proceeding with a trial without enlisted persons on the court, and the requirement of a detailed written statement of the ground insures that the purpose of the subdivision will be complied with.

Mr. Brooks. You have heard the article. Do you have some questions, Mr. Rivers?

Mr. Rivers. May I ask you this for the record. Do you consider this strong enough to assure the minimum of criticism of the enlisted man serving on the juries when an enlisted man is tried? There is a detailed report there.

Mr. Smart. It is my opinion, Mr. Rivers, that this answers the complaint of enlisted people. I have some statistics which I would like to submit for the record on the ideas of enlisted persons, as to whether or not this is a good section.

\* \* \* \* \* \*

Mr. Rivers. Yes.

Mr. Smart. At the time we included the enlisted-man provision for Army courts martial we really didn't know how enlisted men felt about it. Ranking officers then and since that time have stated to me that they doubt that it will be of any assistance or benefit to enlisted persons.

Mr. Rivers. Well, it can't hurt.

Mr. Smart. I don't agree necessarily. It may hurt them because some of these "crusty" noncoms might throw the book at these boys where officers would probably be a little more lenient.

Mr. Rivers. That is right.

Mr. Smart. But I would like to point out, and I have found this to be true beyond any doubt through interviewing 930 enlisted men during last October: I find that, excluding the 60 to 80 young men who were recruits or OCS candidates from the total, about 93 percent of the men expressed the desire to have the option to have enlisted men on their courts if they want them.

Mr. Rivers. Well, that is all right.

Mr. Smart. And I asked three different questions. First, how many of you would like to be tried by an all-officer court? Second, how many of you would like to have the option to have at least one-third enlisted men on your court? Third, how many of you would like to be tried by an all-enlisted-man court? Out of 930, only 1 soldier stated that he would like to be tried by an all-enlisted-man court.

Ninety-three percent want the option to be tried by a court partially composed of enlisted men, as is provided in this article.

*A Bill to Unify, Consolidate, Revise, and Codify the Articles of War, the Articles for the Government of the Navy, and the Disciplinary Laws of the Coast Guard, and to Enact and Establish a Uniform Code of Military Justice: Hearings on H.R. 2498 Before a Subcomm. of the House Comm. on Armed Services*, 81st Cong., 1st Sess. 1139–40 (1949).

The Uniform Code of Military Justice, including Article 25, was enacted as H.R. 4080, and signed into law on 5 May 1950. Pub.L. No. 81-506, 64 Stat. 108, 50 U.S.C. §§ 551–736. Subsequent modifications of Article 25, including those by the Military Justice Act of 1968, Pub.L. No. 90 632, 82 Stat. 1335, 10 U.S.C. §§ 801–940, are not relevant to the issue presented in this case.

17. In a prepared statement accompanying his testimony concerning the proposed Uniform Code of Military Justice, Brig. Gen. Franklin Riter, a reservist in the Army JAG Corps, who served on active duty during and following WW II, stated:

The right of an accused soldier to demand the presence of enlisted personnel on either a general or special court martial first made its appearance in A.W. 4, as amended by H.R. 2575. The uniform code retains this provision, and it is now in operation. The first courts to which were appointed enlisted personnel were convened by Headquarters Command, USAF, at Bolling Air Force Base, District of Columbia, and also by a court-martial jurisdiction in Heidelberg, Germany. Its value is yet to be demonstrated. The special committee on military justice of the Association of the Bar of the City of New York wrote thus:

"There has been considerable discussion concerning the presence of enlisted men on military courts. Your committee believes that the public attention given to this aspect of the bill far outweighs its importance. The *presence of enlisted men on courts is of* doubtful value to the accused, since, in all likelihood, those appointed would be career soldiers, more severe than officers or their subordinates. If, however, the provision tends to give the enlisted man more confidence in the courts and a greater feeling that justice will be done, we see no objection to the experiment."

The committee above quoted has probably stated the real value of such provision. If the

suggestions for change to, the Articles of War, and the Articles for the Government of the Navy.[18] As a result of the committee reports, legislative proposals were submitted by the War Department and the Department of the Navy, and bills were submitted by several individual Senators and Congressmen. While a complete catalog of these proposals is unnecessary, some indication of their diversity is helpful in understanding the compromise process which led to the enactment of the statute substantially in its present form.[19] One

proposal would have made the appointment of enlisted members mandatory for *all* general courts-martial.[20] Others required enlisted members at the request of an enlisted accused.[21] Still others would have made the appointment of enlisted members discretionary with the convening authority, at his own initiative, or at the request of the accused.[22] As to proportionate representation, the proposals ranged from providing for a majority of enlisted members,[23] to at least one-half,[24] to at least one-third,[25] to a minimum of one or two.[26]

insistence that enlisted men be placed on courts martial is motivated by the idea that the courts would be more lenient, the proponents of the plan will most probably be bitterly disappointed. In the opinion of the witness, the presence of qualified, intelligent enlisted men on the court will not in any respect result in more acquittals or in less onerous sentences. If, on the other hand, the placement of enlisted men on courts is prompted by the desire to strengthen the courts in the eyes of both the public and the enlisted personnel, this change is justified. *Bills to Unify, Consolidate, Revise and Codify the Articles of War, the Articles for the Government of the Navy, and the Disciplinary Rules of the Coast Guard, and to Enact and Establish a Uniform Code of Military Justice: Hearings on S. 857 and H.R. 4080 Before a Subcomm. of the Senate Comm. on Armed Services,* 81st Cong., 1st Sess. 183 (1949).

Testifying at a hearing on the aforementioned amendment to the Articles of War, Brig. Gen. Hubert D. Hoover, Assistant Judge Advocate General of the Army for Military Justice Matters stated:

As we conceive it, the appointment of enlisted persons is designed not to expand the groups of persons who may be eligible to serve on courts martial in order that we shall have an additional reservoir of eligibles, but, if we may put it that way, the appointment is authorized in deference to what appears to be the public demand for participation by enlisted persons in courts martial.

*A Bill to Amend the Articles of War to Improve the Administration of Military Justice, to Provide for More Effective Appellate Review, to Insure the Equalization of Sentences; and for other purposes: Hearings on H.R. 2575 Before a Subcomm. of the House Comm. on Armed Services,* 80th Cong., 1st Sess. 2019 (1947).

**18.** The Secretary of War appointed a committee, known as the Advisory Committee on Military Justice, headed by Dean Arthur Vanderbilt, and composed of prominent lawyers. Several similar committees were appointed by the Secretary of the Navy. After studying the rec-

ommendations of the committees, both Departments submitted proposed bills to change their systems of military justice. The Army bill was S. 903 and H.R. 2575. The Navy bill was S. 1338 and H.R. 3687. For further detail, and a general overview of the post-war precursors of the Uniform Code of Military Justice, *see,* Courts Martial Legislation, Senate Committee on Armed Services, a Study of the Proposed Legislation to Amend the Articles of War (H.R. 2575); and to Amend the Articles for the Government of the Navy (H.R. 3687; S. 1338), 80th Cong., 2d Sess. (1948).

**19.** As indicated in the commentary accompanying Article 25 (note 16, *supra*), the first provision for enlisted court-martial members was enacted as an amendment to the Articles of War, by the Selective Service Act of 1948, Public Law 759, 62 Stat. 627, 80th Cong., 2d Sess. (1948). As amended, A.W. 4 required that, upon an enlisted accused's written request for enlisted members, at least one-third of the court which tried him must be enlisted persons. A.W. 16, as amended, prohibited any enlisted person from sitting as a member of a court-martial for the trial of another enlisted person of the same company or corresponding military unit.

**20.** H.R. 965, 80th Cong., 1st Sess., introduced by Rep. Rains, 14 January 1947.

**21.** H.R. 576, 80th Cong., 1st Sess., introduced by Rep. Durham, 7 January 1947; H.R. 2575, 80th Cong., 1st Sess., introduced by Rep. Elston, 17 March 1947, *as reported with amendments,* 22 July 1947.

**22.** H.R. 2575, 80th Cong., 1st Sess., as introduced by Rep. Elston on 17 March 1947.

**23.** H.R. 2143, 80th Cong., 1st Sess., introduced by Rep. Burleson, 21 February 1947.

**24.** H.R. 965, note 20, *supra.*

**25.** H.R. 576, and H.R. 2575, note 21 *supra.*

**26.** See note 26 on page 813.

It was well recognized at the time that even "at least one-third" enlisted members would, if unified, often be capable of controlling the verdict.[27] The fears spawned by this consideration resulted in two basic proposals for limitations on enlisted eligibility. One was to exclude members of the *accused's* unit;[28] the other would have, in addition, excluded members of the *accuser's* unit.[29]

There was a consensus, in view of the sharp demarkation between the enlisted and officer classes, that peer pressure might result in bias among enlisted members closely associated with an enlisted accused. These sentiments were exemplified in the Report of the Committee on Military Law of the War Veterans Bar Association, presented during the testimony of its chairman, Mr. Arthur E. Farmer:

... so long as the status of officers and enlisted men remain as sharply differentiated as they are at present, it would be unjust both to the accused and to the enlisted [members], as well as to the Army from a morale viewpoint, to appoint enlisted men to sit on courts martial.[30]

Even among proponents of the various proposals to place enlisted members on courts-martial, the legislative history reflects considerable concern as to the practical consequences of such an innovative measure. It was important, of course, that courts-martial not only do justice, but that they also *appear* to do justice. The concern was that the presence of enlisted members, while bolstering the appearance of justice, might in fact diminish the actual quality of justice.[31] Then, as now, it was recognized that courts-martial, as compared to civilian

26. Testifying before a subcommittee of the House Armed Services Committee, Col. Pinckney McElwee, an Army JAG Department reservist who saw service throughout WW II, and served on the post-war clemency board headed by Mr. Justice Roberts, suggested:

> I would say, along there, in article 4, that it would be well to include enlisted men on the court, and to have an addition there, saying the court should not, have less than two in its composition. In other words, some 'commander who is so disposed might say, "well, we will put an enlisted man on the court and 11 officers." In other words, they can control the thing if they wanted to by just putting one on, which would be more or less evading the thing. If they required them to put on a minimum of two, it would be a little more difficult.

Hearings on H.R. 2575, note 17, *supra*, at 2107.

27. The requirement is that *at least* one-third of the members who *serve* on the court-martial be enlisted persons. Thus, unless, after excusal or challenge of appointed members, there is *precisely* one-third (1 out of 3 at a special court-martial, or 2 out of 6, 3 out of 9, 4 out of 12, etc., at a special or general court-martial), the percentage of enlisted men must *exceed* one-third. (E. g., at least 2 members of a 4 member special court-martial must be enlisted; at least 2 of 5, 3 of 7, 3 of 8, 4 of 10, 4 of 11, etc., must be enlisted at a general or special court-martial.) Since at least *two-thirds* of the members must concur in both findings and sentence, Article 52, Uniform Code of Military Justice, 10 U.S.C. § 852, both a verdict of guilty and any punishment could be thwarted by an alliance of the enlisted members.

28. H.R. 2143, note 23, *supra*; H.R. 2575, note 22, *supra*; S. 903, 80th Cong., 1st Sess., introduced by Senator Gurney, 14 March 1947.

29. H.R. 576, note 21, *supra*. The failure of Congress to enact the accuser's-unit limitation on eligibility of enlisted members is consistent with the view that (a) prejudice or bias could be handled by routine challenge procedure (*see* note 38, *infra* and accompanying text), and (b) the accused should be afforded maximum opportunity to have enlisted members on his court-martial, if he wishes (*see* notes 42, 43, *infra*, and accompanying text). In the rare circumstances that the only available and eligible enlisted members belonged to the accuser's unit, the accused would not likely request them, but if he did, compelling the convening authority to comply with that request would not have an adverse impact upon justice, or upon discipline within the accused's unit (*see* note 45, *infra*, and accompanying text).

30. Hearings on H.R. 2575, note 17, *supra*, at 1989.

31. The Report of the War Department Advisory Committee on Military Justice (better known as the Vanderbilt Report), note 18, *supra*, dated 13 December 1946, pointed out that those opposed to inclusion of enlisted members on courts-martial feared that,

> ... since the movement of qualified enlisted men in the Army is upward, the appointment of enlisted men will lower the quality of the courts and give rise to personal antagonism and recrimination in army units when enlist-

criminal trials, resulted in few acquittals of the guilty, and even fewer convictions of the innocent. The injection of a new variable, which might increase unwarranted convictions or acquittals was regarded with considerable apprehension. Not only was the integrity of the court-martial system of justice at stake, but of paramount concern was the impact of a diminution in the quality of military justice upon military morale and discipline. If the actual or perceived ability of courts-martial to dispense justice was diminished, a corresponding diminution in morale and/or discipline could be anticipated. This, in turn, would have an adverse

impact upon the ability of our fighting forces to carry out their missions in war or peace.[32]

The majority opinion has focused upon one portion of the Article 25 limitations relative to the appointment of enlisted members: what is a "unit"? Focusing solely upon that question, it is not difficult to find support in the legislative history for the theory advanced in the majority opinion, namely that the purpose of the exclusion of members of the accused's "unit" was to exclude enlisted members who work (or fight) and live (or die) in close proximity to

ed men participate in the conviction and sentence of their fellows.

**32.** Courts Martial Legislation, note 18, *supra.* The legislative study prepared for the Senate Armed Services Committee reflected both a contemporaneous and an historical concern that the effectiveness of our fighting forces is dependent upon the effectiveness of our system of military justice:

The difference between a military and a civilian organization was recognized in the fifth amendment of the Constitution, which specifically excepts from its guaranty of indictment by a grand jury "cases arising in the land and naval forces." By judicial interpretation the same exception has been held applicable to the guaranty of jury trial recognized in the sixth amendment. This exception was considered so obvious by the founding fathers that it did not call forth a single word of discussion as it passed through the first session of the First Congress.

The objective of a democratic form of government is to enable people to live together in peace and in reasonable happiness. The object of criminal law is to secure to every human being in a community all the liberty, security, and happiness possible, consistent with the safety of all. The civilian community is content simply to restrain assaults, while letting its members go on about their several businesses, whereas the military not only wants its men to refrain from striking each other, it wants them all to march in a prearranged direction. The Military Establishment needs obedience; must have it. The civilian community does not need it to the same degree, nor for the same purpose. While an army composed of literate, free men can be led in a large measure by precept, example, and exhortation, there is always a large indifferent segment, and always an irreducible minimum who respond only to the fear of the consequences of disobedience. It is only through punishment and the fear of punishment that this last group can be made

to obey. An armed expedition of 2,000,000 men is a totalitarian organization which must in the final analysis obey implicitly the decision of one man and, by a natural evolution of command, every man must immediately and without question obey his immediate superior, even if it means his death. The commander cannot obtain this obedience unless such obedience can be made preferable to the alternative fate in store for those who malinger.

In a military organization, because of its nature, justice cannot be based solely upon the crime that the man has committed. It must be based to some extent upon the effect the punishment will have on the morale of the remainder of the command.

Therefore, it seems a reasonable conclusion that, since the objectives of civil and military justice are wide apart, each requires its own separate system of laws—statute and common. And because an army or a navy is a collection of armed men obliged to obey one man, every enactment, every change of rule which impairs this principle weakens the army, impairs its value, and defeats the very object of its existence. All the traditions of civilian lawyers are antagonistic to this vital principle, and it is here that the argument has raged, with military men defending their position on the grounds above stated, and the civilian-turned soldier attacking this position because of its basic differences from the laws of his civil society.

The tradition of civil justice and the traditions behind military justice are different. The military man believes that his concept of military justice is vital, and that, if it is not applied, an army will become demoralized by grafting onto the military code the deductions obtained by considering only the civil code and practices. This is the crucial point which must be decided by the Congress in the consideration of this pending legislation. *Id.* at 3, 4.

the accused.[33]  It is not hard to accept the conclusion, even absent empirical evidence, that such members would be more likely than others to harbor bias for or against the accused.[34]  Not surprisingly, it is also possible to find quotes supporting the logical fear that such enlisted members might be subject to various pre-trial pressure or post-trial retribution from peers or superiors.[35]

While superficially appealing, these considerations, adopted as the majority's theory for the intent behind the statutory exclusion of enlisted members from the accused's "unit", fail to consider three important factors.  The first is what Article 25 does *not* cover, and the other two are integral parts of Article 25, to which we must accord due deference in construing the statute.[36]

*First*, Article 25 does not purport to be a substitute for common sense on the part of the convening authority.  Given free choice in the matter, it is exceedingly unlikely that a convening authority would attempt to "pack" the court with the accused's buddies.  In a similar vein, Article 25 is not the portion of the Code which deals with attempts to influence or punish court members in regard to or as a result of their service on a court-martial.  Such activity is expressly made punishable elsewhere in the Code.[37]  Moreover, at the trial itself, the Code provides for a voir dire and challenge procedure to eliminate from the court any members who are biased for or against the accused.[38]

---

**33.**  *See* note 16, *supra*, commentary on subdivision (c), proposed Article 25, Uniform Code of Military Justice.

**34.**  During the floor debates on H.R. 4080, note 16, *supra*, Senator Kefauver stated:

Let us consider a case which is to be tried on shipboard.  The law provides, and correctly so, that the service members of a court must not be in the same unit with the accused, so that they would not be particularly buddies of his.  If a panel were required for a court martial to try someone who might be accused of an offense, I do not know where it would come from.  An accused would have to be incarcerated perhaps over a period of many weeks and, in some cases, many months, before he could be brought back to shore, where a panel would be available to try him.

Congressional Floor Debate on the Uniform Code of Military Justice, Department of the Navy, Judge Advocate General, at 295 (1950).

**35.**  During the subcommittee hearings on H.R. 2575, note 17, *supra*, Mr. Arthur E. Farmer, Chairman of the Committee on Military Law of the War Veterans Bar Association stated:

If you are an enlisted man and it becomes known that you are to sit on a court trying a certain accused, you have got to expect that friends of the accused in his unit are going to put pressure on you.  When you come off the court if the man has been convicted, there are very likely to be small vendettas carried out, and there again I think we would not have a healthy condition and I don't think such a condition would be conducive to morale.

*Id.* at 1995.

**36.**  73 Am.Jur.2d, Statutes, § 250.

**37.**  Article 37, Uniform Code of Military Justice, prohibits wrongful influence, by anyone subject to the Code, upon the members, counsel or judge of a court-martial.  Its provisions extend even to protecting members from consideration of their court-martial service in fitness reports evaluating their performance of duty.  Violations of Article 37 are subject to punitive sanction under Article 98 of the Code, 10 U.S.C. § 898.  Less subtle forms of intimidation or retribution are covered by Articles of the Code proscribing threats (Articles 127, 10 U.S.C. § 927, and 134), and assaults (Articles 128, 10 U.S.C. § 928, and 134).

**38.**  It was never intended by the drafters of the Code or by Congress that Article 25 would address all sources of disqualification for court members.  In this regard, there were two illustrative colloquies during the subcommittee hearings on H.R. 2498, note 16, *supra*:

Mr. Philbin.  Do you have any way provided by which the accused can object to the members of the court?

Mr. Larkin.  Yes.  There are challenges for cause as to each member.  And then you have a peremptory challenge where you can challenge one member, that is any one member, without reason at all.

Mr. Rivers.  Each defendant could challenge one man?

Mr. Larkin.  According to the modification we have made, yes sir.

Mr. DeGraffenfried.  What I had in mind, though:  There are oftentimes where the counsel doesn't have any information.  The only way he has of getting the information is by asking the person himself as to whether he has heard so much about the case that he is prejudiced on one side or the other and couldn't go by the evidence in the case.  You

*Second* the Article 25 exclusion of enlisted members of an accused's "unit" is only one part of the overall limitation bearing upon the appointment of enlisted members. Another part is that portion of the definition of the term "unit" preempted by the Code, and not left to Secretarial discretion. In the Air Force, "unit", as defined by the Secretary, can be no larger than a squadron. Article 25(c)(2), Uniform Code of Military Justice; paragraph 4*b*, Manual for Courts-Martial, 1969 (Rev.). Viewed in isolation this portion of (or subtraction from) the limitation on eligibility appears to make no particular sense.[39] Yet, it was intended

> wouldn't have heard one thing about it one way or the other. That is what I had in mind.
>
> There are certain people who don't believe in capital punishment under any circumstances. Well, he might not have expressed his opinion. You wouldn't know it. But the only way you could find it out would be by asking him.
>
> Mr. Larkin. That is right.
>
> Mr. Elston. There is no limit to the number of challenges for cause?
>
> Mr. Larkin. No, sir.
>
> Mr. Elston. And my understanding is that the rules are practically the same as they are in the civil courts. You may examine any member of the court and if the court is satisfied that any member of the court is prejudiced against the accused or he doesn't believe in capital punishment or there is any reason why he can't grant a fair and impartial trial, a challenge for cause will lie?
>
> Mr. Larkin. That is right, and be sustained, I should say, on the proof of any of those circumstances.

*Id.* at 1141–42.

At a later point, in regard to what is now the last sentence of Article 25(d)(2), the discussion concluded:

> Mr. DeGraffenfried. Over on page 23 of the bill, on line 19, it says: "No person shall be eligible to sit as a member of a general or special courts martial when he is the accuser or a witness for the prosecution or has acted as an investigating officer as counsel in the same case."
>
> Would it be worth while in your opinion to add to that "or who has a fixed opinion as to the guilt or innocence of the accused", or can you reach that in some other way?
>
> Mr. Larkin. I think you reach that in your challenge for cause.
>
> Mr. DeGraffenfried. All right, sir.
>
> Mr. Larkin. I think that is clearly taken care of under that.
>
> Mr. DeGraffenfried. All right, thank you.

to, and does in fact, play a pivotal role in protecting the existence of the right of an accused to have enlisted members on his court-martial. It does so by ensuring that, in exercising his delegated authority to define the term "unit", the Secretary cannot make the term so broad as to effectively deny the accused the right to enlisted members.[40] As an extreme, for example, the Secretary might, without the codal restriction, designate the entire Air Force as one "unit", thereby rendering all Air Force enlisted personnel ineligible for duty as court members.

*Id.* at 1148. The referenced challenge procedures were provided for in what is now Article 41 of the Code, 10 U.S.C. § 841. *See also,* paragraph 62, Manual for Courts-Martial, 1969 (Rev.).

**39.** It is our judicial function however, to reconcile and construe in a harmonious fashion all portions of a statute. *See,* 73 Am.Jur.2d, Statutes, § 250.

**40.** During the subcommittee hearings on H.R. 2498, note 16, *supra,* the following discussion occurred:

> Mr. Elston. I think you have explained already the other question I had and that was a definition of the word "unit" in line 15, where you say "where a person is not a member of the same unit."
>
> Mr. Larkin. That is partially defined, I should say, in the second paragraph of subdivision (c). Your bill, if you will recall, last year provided for the Army only that no enlisted person in the same company or corresponding unit would be eligible to sit on the court of an accused from that unit. We have continued the same idea of a unit, but since we were dealing with the Navy as well, the nearest unit we could arrive at was a ship's crew.
>
> *The definition is not very complete, I concede, but it is difficult to find an exact comparison. Actually there is none. So we let it or we felt it best to leave it to the departmental secretaries to determine the units that they think appropriate for their own services, but we have restricted them by not permitting them to say that anything bigger than a ship's crew is a unit.*
>
> Now of course in some few instances that may be a large body of people, such as on a battleship, but we just couldn't find any other unit and at least they can't say that a unit is something bigger than a ship's crew, you see. [emphasis added]

*Id.* at 1144.

*Third*, the final part of the Codal limitation on appointment of enlisted members (who are not otherwise ineligible under Article 25(d)), is that if no *eligible* enlisted members are available because of "physical conditions or military exigencies", the trial may proceed without them, despite the accused's request. The use of the term "eligible" here relates directly to the "unit" limitations previously discussed—in fact, this part of the Codal limitation appears to be the principal purpose for the other parts:

    a. The "same-unit" limit on eligibility, viewed alone, is redundant to common sense on the part of the convening authority, separate Codal provisions prohibiting attempts to influence or retaliate against court members, and the challenge procedure;

    b. The subtraction from that limit, making the disqualifying unit no larger than a squadron, precludes nullification of the accused's right to enlisted members in normal circumstances, but would be altogether unnecessary without the "same-unit" limit.

The aforementioned limits are *necessary* for only one purpose: to protect the integrity of the court-martial in an isolated location or in combat conditions.[41] They are the foundation on which is built the exception for the requirement for the convening authority to appoint enlisted members. They were essential to narrowly limit the circumstances in which the accused may be tried without enlisted members despite his request therefor.[42] Specifically, they ensure that wherever and whenever an enlisted accused is tried by court-martial, he has the right to enlisted members, *unless*, as a result of physical conditions or military exigencies, only members of the accused's unit are available, and that unit is of squadron size or smaller.[43]

---

**41.** In hearings on H.R. 2575, note 16, *supra*, Under Secretary of War Kenneth C. Royall stated:

> There might be instances in actual operation, particularly in war and with isolated units, where it would be difficult to get competent enlisted men, unless you get them from a man's own company, which I don't think anyone wants to do. We might find in the future that enlisted men on courts would create divisions and feelings between enlisted men and officers in the same court and might militate against the needed discipline.

*Id.* at 2147.

**42.** One witness at the Senate hearings on S. 857 and H.R. 4080, note 17, *supra*, summarized the pivotal significance of the exception, and its relations to the rest of the limits on appointment of enlisted court members:

> I have heard some misgivings expressed with reference to the provisions set forth in article 25(c)(1) with reference to the service of enlisted persons on courts martial. The question arises from the clause "Unless eligible enlisted persons cannot be obtained on account of physical conditions or military exigencies."
>
> The other provisions of this section leave little doubt that it is the intent of the Congress that, when an accused enlisted person requests the presence of enlisted persons on the court martial trying him, enlisted persons shall be included on the court. Probably the saving clause which has led to misgivings should not be eliminated, but I hope that this committee, in its report, and members of this committee during floor discussion of this bill, will make crystal clear the legislative intent of the entire section, and specifically that this saving clause is intended for emergencies and other situations in which eligible enlisted persons absolutely cannot be obtained.

*Id.* at 142 (Statement of Joseph Clorety, Jr., vice chairman, American Veterans Committee).

**43.** During the House hearings on H.R. 2498, note 16, *supra*, Mr. Felix Larkin, Assistant General Counsel, Office of the Secretary of Defense, clarified the relationship of the exception for "physical conditions or military exigencies" to the "unit" limit on eligibility:

> Mr. Elston. Mr. Chairman, I had another question. I believe someone who testified before us indicated that there is a loophole here in that enlisted persons could be excluded if it was considered impossible to obtain competent enlisted persons. Now, can you give us any case in which competent enlisted persons might not be available? There are always more enlisted persons around than there are officers.
>
> Mr. Larkin. Yes; that is right. That specific provision in subdivision (c) was, as I recall, objected to by Mr. Wolman. It is a difference and one which I wish to point out to the committee. It differs from the provisions of the Elston bill last year.
>
> Last time it was provided, that is your committee provided, for the Army only that where an enlisted man requested enlisted men on his court, he could not be tried unless such enlisted men were on the court, al-

Thus, while the limits on eligibility of enlisted court members may afford the accused some ancillary benefits redundant to the challenge procedure, or codal provisions designed to preclude unlawful influence on court members, the purpose of those limits in Article 25 is *not* to protect the accused.

They are intended to preclude compelling the convening authority to appoint enlisted members—or forego trial—under the particularly delicate conditions of combat or a remote environment, where appointment of enlisted members from the accused's "unit" would have a grave potential for subverting

though members of his own company were not competent to sit on that court.

Now, when we addressed ourselves to the problem of enlisted men and tried to make it apply to the Navy as well—and as designed by your committee problems of the Navy I am sure were not before you—it seemed to us that you would have a number of circumstances in the Navy where a man would request enlisted men on his court and by virtue of the fact that none of the men in his own ship's crew, in this so-called unit, were eligible to sit, you might be faced at sea particularly in special courts with the situation that no other eligible men were available.

The men of his own ship, of course, are not eligible and the problem of trying to transfer some enlisted men on the high seas from another ship is so great that unless you made provision for trying him without enlisted men even though he had requested them in those extraordinary circumstances, you couldn't try him at all perhaps for a lengthy period of time.

Now, we realized that to leave any discretion with the commander was bordering on a situation where there might be criticism that commander would not follow the spirit of this provision and the intent of Congress that there be enlisted men where the enlisted men wanted them on generals and special courts.

So for that reason we attempted in providing for that isolated exception that in such event the convening authority, if he finds the circumstance is such that there are no eligible enlisted men available at sea, because the ship's crew are not eligible, shall make a detailed written statement to be appended to the record stating why he found it impossible to obtain eligible enlisted men at the time.

Mr. Elston. It doesn't say "eligible." It says "competent."

Mr. Larkin. Well, it is the same notion, I think.

Mr. Elston. Well, "competent"—an officer might interpret that to mean a person who is incompetent by reason of lack of intelligence.

Mr. Larkin. Of course, there is a provision covering that, but our idea as I am trying to reconstruct it would have the exception apply only when there are no eligible men, eligible in the sense or competent in the sense that there are no enlisted men outside of the unit.

Mr. Elston. Wouldn't "eligible" be a better word than "competent"?

Mr. Brooks. I think so.

Mr. Elston. I don't know what the term "physical conditions" means, either.

Mr. Larkin. I think "physical conditions" are the physical conditions that are encountered on the high seas where ships are separated physically. It is very dangerous and very difficult to transfer men from one ship to the other.

And "military exigency" I think has more to do with the isolated unit. In the commentary we set forth further our idea of how restricted the exception should be, where we say in the 1st paragraph of the commentary—

"The last sentence of the first paragraph of subdivision (c) was added to make it possible to proceed with the trial where competent enlisted persons can't be obtained. This is to avoid long delays in the administration of justice and the expensive process which might otherwise be necessary of transporting witnesses or court members great distances. Such delays and expenses could arise in connection with offenses committed on ships at sea or on isolated units ashore such as remote weather stations. The language of the subdivision makes it clear that mere inconvenience is no ground for proceeding with the trial without enlisted men on the court and the requirement of a detailed written statement of the ground insures that the purpose of the subdivision will be complied with."

Now we intended that that be part of the legislative history, as instructions to the commanders and the people that write the manual that it would only be in the most exceptional type of case that they would proceed and it would only be after the commander writes a statement of the conditions he has faced which made it impossible for him to obtain enlisted men and the statement is to go with the record.

So it will not just be arbitrary or capricious convenience of his which he could adopt in order to avoid using enlisted men in the event he was the type of commander who wasn't sympathetic with this provision.

*Id.* at 1149–51. In the final enactment, the word "eligible" was substituted for the word "competent."

justice and undermining military discipline.[44]

The two codal limitations on the accused's right to enlisted members were enacted for divergent reasons, as part of a consistent statutory scheme: (1) the limitation on eligibility of court members from the accused's unit was designed to preclude the possibility that an alliance of enlisted members could obstruct justice within a small isolated unit by relieving the convening authority from any duty to place enlisted members of such "unit" on the accused's court-martial; (2) the limitation on the Secretary's authority to designate the size of "units" was to preserve the existence of the accused's right to enlisted members on his court-martial under all other conditions.

In my view, the legislative history is in total accord with the literal language of the Code, as it pertains to the appointment of enlisted members. In essence, the Code—as it was intended—creates an inchoate duty for the convening authority to appoint enlisted members. The sole condition necessary to trigger that duty is the accused's written request. There is, however, a narrow exception, relieving the convening authority of that duty under relatively dire circumstances, where the only available pool of enlisted members is the small and cohesive "unit" to which the accused belongs. The purpose of that narrow exception, created by the limitations on enlisted member eligibility, was to preserve the integrity of the court-martial in the extremes of isolation or combat.[45]

IV. CONCLUSION.

As a result of today's decision, a basic, clear, and settled codal provision has become unnecessarily ambiguous and uncertain. Prudent convening authorities can avoid possible error by ensuring that the accused and the enlisted court members do not come under the disciplinary, administrative, or supervisory authority of a common third person at (or near) the squadron level. Potentially, however, the resulting expansion of the class of "ineligible" enlisted personnel will serve to deny enlisted court members to an accused, in a remote or combat location, who would otherwise be afforded that right under Article 25.

I find no error in the composition of the court-martial which tried the accused. I have considered the remaining assignments of error, and would resolve them adversely to the accused. Thus, I would affirm the findings of guilty and the sentence.

---

**44.** I do not mean to imply that military justice is merely an instrument of military discipline. It must be recognized, however, that like the general social order, military discipline is dependent upon the fair and even-handed application of justice in the enforcement of the law.

**45.** Reflective of this concern by Congress is the statement of Lt. Gen. J. Lawton Collins, an infantry commander in both the Pacific and Europe in WW II:

During the war we served all over the world and there were many cases where there were relatively small groupings of men, for instance, in the China-Burma theater—and if we had mandatory provisions that required enlisted men to serve on such courts, I think often it would have delayed justice. It might have made it impossible to have a court at the place where the crime was committed. When you consider that many times the witnesses were native; or they were people that couldn't be picked up and moved from that location to some other place where there were enough men and large installations to guarantee getting qualified men, I think you will see that if you make it wholly mandatory and rigid, it would be a rather difficult provision to actually administer.

House hearings on H.R. 2575, note 17, *supra*, at 2156.